UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DO NOT PASS GO, LLC, NEXT STEP RECOVERY HOMES, INC, KENNETH D. SIMS, and JASON RIDLEY, individually and on behalf of all those similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>CITY OF ROCKFORD,<br><br>          Defendant. | No. 24 C 50074<br><br>Judge Rebecca R. Pallmeyer |

**MEMORANDUM OPINION AND ORDER**

After serving a custodial sentence, an individual convicted of a crime in Illinois is ordinarily released to the community but subject to a period of continued supervision, known as "mandatory supervised release." A critical challenge for these individuals is finding suitable housing. In December 2023, the City of Rockford, Illinois amended its Zoning Ordinance to prohibit more than one individual on mandatory supervised release or other forms of criminal-justice supervision from living at the same address in any single-family or two-family residential zone within the City. The Ordinance not only restricts the availability of housing for persons under supervision; it also limits the uses that certain landowners can make of their property. Plaintiffs are two landlords who operate group homes for individuals on supervised release in Rockford and two individual tenants of these homes. They have sued the City under 42 U.S.C. § 1983, alleging violations of the Fourteenth Amendment's Equal Protection Clause on behalf of themselves and a putative class. The City now moves to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, that motion is denied.

**BACKGROUND**

I.  **Illinois's Residency Requirements for Individuals with Sex-Offense Convictions Under State Supervision**

This case takes place against the backdrop of several recent legal challenges to the State of Illinois's residency requirements for individuals with sex-offense convictions. Both parties address these cases in their pleadings and briefs; given their clear relevance to the dispute here, the court pauses to review them before turning to the facts of the case at bar.

Under Illinois law, prisoners who have reached the end of their sentences must locate suitable "host sites" at which to reside while on supervised release. *See Cordrey v. Prisoner Rev. Bd.*, 2014 IL 117155, ¶¶ 5–9, 21 N.E.3d 423, 429. For individuals with registered sex offenses, finding these host sites can be difficult thanks to a constellation of restrictions governing where they may live. The State may prohibit such individuals from "resid[ing] near" locations such as "swimming pools, beaches, theaters, or any other places where minor children congregate" unless they secure advance permission from the Illinois Department of Corrections ("IDOC"). 730 ILCS 5/3-3-7(b-1)(12). More generally, any person classified as a "child sex offender" is forever barred from residing within 500 feet of a school, playground, or daycare. 720 ILCS 5/11-9.3(b-5), (b-10). And until recently, no two individuals with sex offense convictions could reside at the same building anywhere in Illinois while on supervised release. 730 ILCS 5/3-3-7(a)(7.6).

In *Murphy v. Raoul*, a class of indigent prisoners who had served their sentences for sex offense convictions but remained incarcerated due to their inability to afford compliant host sites challenged this indefinite detention as unconstitutional. 380 F. Supp. 3d 731, 737–38 (N.D. Ill. 2019). In March 2019, the *Murphy* court granted the plaintiffs' motion for summary judgment in part, finding that the State's implementation of its residency requirements violated both the Eighth Amendment's ban on cruel and unusual punishment and the Fourteenth Amendment's Equal Protection Clause by creating an illegal classification based on wealth. *Id.* at 759, 766. It later entered a permanent injunction ordering the State to take appropriate steps to ensure that no

*Murphy* class member remained imprisoned.[1] ([156] in *Murphy v. Raoul*, No. 16 C 11471 (N.D. Ill. Jan. 15, 2020).)

In *Barnes v. Jeffreys*, another class of similarly situated prisoners challenged Illinois's "One-Per-Address" statute, the provision of the Illinois Code of Corrections preventing more than one individual with a sex offense conviction from residing at the same address while on supervised release. The *Barnes* court ruled at summary judgment in 2021 that this restriction, too, violated the Eighth Amendment and the Equal Protection Clause as applied to the class. *Barnes v. Jeffreys*, 529 F. Supp. 3d 784, 795, 799 (N.D. Ill. 2021). Another court in this district later extended *Barnes*'s holding to an equivalent residency restriction for individuals on probation for sex offenses. ([74] in *Potkaj v. Watkins*, No. 22 C 7176 (N.D. Ill. Apr. 4, 2024) (permanently enjoining enforcement of 730 ILCS 5/5-6-3(a)(8.6)).)

These rulings have substantially changed the legal regime in Illinois governing housing for individuals with registered sex offenses under State supervision. In response to the *Murphy* injunction, the Illinois Department of Corrections ("IDOC") implemented a new program called the Intensive Community Reintegration Program, or "ICRP." (Compl. [1] ¶ 25 n.2.) The ICRP partners with community organizations to provide subsidized transitional housing for individuals with sex offense convictions on supervised release. (*Id.* ¶ 48.) As of early 2024, it housed nearly 400 people throughout the state. (*Id.* (citing [129] in *Stone v. Jeffreys*, No. 21 C 5616 (N.D. Ill. Feb. 5, 2024).) And thanks to *Barnes*' invalidation of the "One-Per-Address" statute, these program participants may now reside in shared living environments at the same addresses. (*Id.*)

## II.     Rockford's December 2023 Zoning Amendment

Until December 2023, Rockford's Zoning Ordinance imposed no specific limit on the number of individuals on supervised release living in a single location in the city. The Ordinance

---

[1] While *Murphy*'s initial ruling only reached individuals with indeterminate supervised-release terms, a related case later extended the same relief to individuals with determinate supervised-release terms. *See Stone v. Jeffreys*, No. 21 C 5616, 2022 WL 4596379, at *1, *4 (N.D. Ill. Aug. 30, 2022).

divides residential uses into the umbrella categories of "household living" and "group living," with the former defined as residential occupancy of a dwelling unit by either related persons or up to three unrelated persons. *See* Rockford, Ill. Zoning Ordinance §§ 90-002, -002-B, 91-041, -046 (effective Mar. 31, 2023). "Group living" is defined as "[r]esidential occupancy of a dwelling by other than a 'household,'" and includes a number of listed subcategories such as boarding houses, assisted living facilities, and "[g]roup homes for adjustment." *Id.* § 20-004-A. Most forms of "group living," including group homes for adjustment, are prohibited outright in in all "R-1" (single-family) and "R-2" (two-family) districts and allowed only by special-use permit elsewhere.[2] *Id.* tbl. 20-1. But the Ordinance originally defined "group home for adjustment" as a "residence for those under court supervision while on *probation, pre-release, or work release* wherein supervision, rehabilitation and counseling are provided to mainstream residents back into society enabling them to live independently." *Id.* § 90-002-A-6 (emphasis added)). Thus, under Rockford's prior zoning regime, individuals on supervised release were not subject to any explicit residency restriction beyond the generally applicable three-unrelated-person limit on "household" cohabitation, and could live in groups of up to three in the same dwelling unit in Rockford's single-family and two-family neighborhoods.

The text amendment approved in December 2023 (the "Amendment") changed this regime in several ways. First, it extended the listed categories of supervision in the definition of "group home for adjustment" to include facilities for individuals on "parole [or] mandatory supervised release." Rockford, Ill. Zoning Ordinance § 90-002-A-6 (effective Dec. 7, 2023). Second, it clarified that any residence "for *two or more* individuals under supervision" would constitute a "group home for adjustment." *Id.* (emphasis added). Third, it deleted the requirement that the housing provide any "supervision, rehabilitation, or counseling," meaning that a facility could be a

---

[2] The Ordinance makes exceptions for certain types of congregate housing, including "community-based housing" for persons with disabilities, which is a permitted use in all residential zones as long as the proposed development has six or fewer residents. *See* Rockford, Ill. Zoning Ordinance tbl. 20-1.

4

"group home for adjustment" even if it provided no such services. *Id.* Fourth, it added a new sentence clarifying that "[f]or purposes of this subsection 6, any property with multi-unit dwellings shall be considered one residence." *Id.*

These changes significantly restrict the group housing available in Rockford for persons under State supervision. The Ordinance now prohibits them from living at the same address in any area zoned for single-family or two-family homes—even if they are residing in separate units within the same building. Plaintiffs allege that this "has the effect of putting affordable housing in the City off limits to persons on supervised release." (Compl. ¶ 3.) Based on enforcement letters sent out by the City in January 2024, at least 41 people residing in Rockford as of that date were living in locations rendered noncompliant by the Amendment. (*Id*. ¶ 4 n.1.)

The legislative history submitted with the Complaint suggests that the City's Department of Law proposed the Amendment in response to a perceived "influx of sex offender parolees" being placed in Rockford by the IDOC. (Compl. ¶ 15.) According to a report from a November 21, 2023 meeting of the City's Zoning Board of Appeals, the definition of "Group Home for Adjustment" had always been "intended to include those on parole and mandatory supervised release," but the prior text had been interpreted as permitting people with sex offense convictions on supervised release to reside together in "multi-unit properties," including three properties in one of the City's residential neighborhoods that "proposed to house up to three (3) parolees in each unit of the 4-unit buildings." (Compl. Ex. 3 [1-3] at 3.) At a meeting of the City Council's Code & Regulation Committee one week later, the City's Legal Director Nicholas Meyer further testified in favor of the additional restrictions, observing that "a number of individuals have been released to the Rockford area from prison on mandatory supervised release," and that many of these individuals were "from outside Winnebago County." (Compl. ¶ 16.) The Committee recommended sustaining the Zoning Board's approval of the Amendment, and it was formally adopted a few days later. (Compl. Ex. 4 [1-4].)

5

III. **Enforcement and Procedural History**

Plaintiffs Do Not Pass Go LLC ("DNPG") and Next Step Recovery Homes, Inc. ("Next Step") are corporate landlords who provide housing to individuals on supervised release in Rockford. (Compl. ¶ 9.) As of February 2024, DNPG housed a total of seven tenants in two residences in Rockford, both in single-family zoning districts. (*Id.* ¶ 19.) Next Step owns six residences in Rockford, including three in single-family districts, that housed a total of 16 tenants. (*Id.* ¶ 24.) Next Step (but not DNPG) is identified in the Complaint as a contractor for the State's ICRP initiative created in response to the *Murphy* injunction. (*Id.* ¶ 25.) The individual Plaintiffs, Jason Riley and Kenneth Sims, were both released from prison in the last few years and are currently on supervised release; as of February 2024, Riley was one of DNPG's tenants and Sims was one of Next Step's. (*Id.* ¶¶ 30, 35.)

In January 2024, the City sent notices to DPNG and Next Step that their properties were out of compliance with the newly amended Ordinance for housing more than one "sex offender parolee . . . at each residence." (Compl. ¶¶ 21, 26; *see* Compl. Ex. 2 [1-2] (January 2, 2024 notice of violation from Legal Director Meyer to DNPG).) These notices threatened to issue citations to DNPG and Next Step and fine them $750 per day per property for failing to comply. (Compl. ¶¶ 21, 27.)

In response, Plaintiffs filed this lawsuit in February 2024 [1]. The corporate Plaintiffs alleged that the Ordinance was causing them "direct and immediate harm," both by forcing them to choose between evicting their current tenants or paying substantial fines, and—in Next Step's case—by causing IDOC to stop placing new ICRP participants in its properties, resulting in lost revenue. (Compl. ¶¶ 22, 28–29.) They further alleged that enforcement of the Ordinance would frustrate their "mission to provide affordable rental housing to persons on [mandatory supervised release]," on the grounds that "[i]t is not economically feasible to have only one tenant" in properties designed for multi-occupant use. (*Id.* ¶¶ 23, 29.) The individual Plaintiffs both alleged that they were unable to afford their own housing, did not want to leave their current addresses

6

in Rockford, and had been unable to find alternative accommodations. (*Id.* ¶¶ 31–34, 37–39.) Plaintiffs brought a single count under the Fourteenth Amendment's Equal Protection Clause and sought injunctive relief and damages on behalf of themselves and a putative class of "[a]ll individuals currently or in the future on Mandatory Supervised Release who reside or seek to reside in the City of Rockford, Illinois." (*Id.* ¶¶ 50, 58–60.)

Plaintiffs quickly moved for a preliminary injunction against Rockford's enforcement of the amended Ordinance [12] and for certification of an injunctive class under Rule 23(b)(2) [13]. The City moved for an extension of time to respond [17], which the court granted in part [18] over Plaintiffs' objections [19]. At an April 29, 2024 hearing, the City confirmed through counsel that it would not be enforcing the Ordinance against current residents, and the court stayed Plaintiffs' preliminary injunction and class certification motions accordingly [26]. The City filed the instant motion to dismiss [27] (hereinafter "Mot.") the following month.

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss, the court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). The court may also consider documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information properly subject to judicial notice. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## **DISCUSSION**

I. **Level of Scrutiny**

The Equal Protection Clause of the Fourteenth Amendment prevents state actors from denying anyone within their jurisdiction "the equal protection of the laws." U.S. Const. amend.

7

XIV. Legislation challenged under the Equal Protection Clause is subject to heightened scrutiny if it "targets a suspect class or addresses a fundamental right." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 637 (7th Cir. 2007). Otherwise, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). Plaintiffs concede that the amended Ordinance, which draws distinctions based on criminal-justice supervision status rather than any judicially recognized suspect class, is subject to rational-basis review.[3]

The rational-basis test requires the court to consider (1) whether the government's stated aim is legitimate, and (2) whether a rational relationship exists between this aim and its chosen approach. *Halgren v. City of Naperville*, 577 F. Supp. 3d 700, 737 (N.D. Ill. 2021), *aff'd sub nom. Lukaszczyk v. Cook Cnty.*, 47 F.4th 587 (7th Cir. 2022). At the motion-to-dismiss stage, plaintiffs facing rational-basis review must "allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *St. John's United*, 502 F.3d at 639 (citing *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)). This is a "very significant burden" to meet in the land-use context. *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 283 (7th Cir. 2003) (citing *Forseth v. Village of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000)). The Seventh Circuit has repeatedly emphasized that "the federal courts are not zoning boards of appeal" and that "absent a fundamental right or a suspect class, for a viable equal

---

[3] The City argued in its opening brief that Plaintiffs' claims should be evaluated under the "class-of-one" line of cases stemming from *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). That doctrine concerns Equal Protection challenges to discrete state actions that single out individuals or discrete groups of individuals "for an illegitimate or irrational reason." *Monarch Beverage Co. v. Cook*, 861 F.3d 678 (7th Cir. 2017). As the City concedes on reply, however, this theory is inapplicable where the plaintiff "challenges a statute or ordinance that by its terms imposes regulatory burdens on a specific class of persons"—here, individuals on supervision. *Id.* at 682. The starting point for this court's inquiry is *Cleburne* and its progeny, not *Olech*.

8

protection claim in the land-use context, the plaintiff must demonstrate governmental action wholly impossible to relate to legitimate governmental objectives." *Id.* (cleaned up).

While rational-basis review is, thus, lenient, it does not give the government completely unfettered discretion, even with respect to zoning. Plaintiffs rely heavily on the Supreme Court's *Cleburne* decision, a factually similar case involving the siting of group homes in residential neighborhoods. The ordinance at issue in *Cleburne* required special-use permits for group homes serving adults with intellectual disabilities. 473 U.S. at 436–37. After the city denied the plaintiff's permit application for such a home, the plaintiff sued to invalidate the ordinance under the Equal Protection Clause. *Id.* That effort failed at the district court, but the Fifth Circuit reversed on appeal, holding that intellectual disability should be considered a "quasi-suspect classification" and that the city's ordinance failed intermediate scrutiny. *Id.* at 437–38. The Supreme Court granted certiorari and sustained the result on different grounds: while intellectual disability was *not* a constitutionally suspect class, the ordinance could not even pass the more permissive standard of rational-basis review. *Id.* at 435. Under this standard, the Court held, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational," and that "some objectives—such as a bare desire to harm a politically unpopular group—are not legitimate state interests." *Id.* at 446–47 (cleaned up). The city had failed to articulate "any rational basis" for how the plaintiff's project would threaten its legitimate interests: while local officials had cited concerns such as neighborhood safety and overcrowding, there was no evidence that these risks were any greater for a home for intellectually disabled residents than for a similarly sized project for abled residents (such as an apartment complex or dormitory) that would be permissible under the zoning code. *Id.* at 448–50. Rather, the record suggested that the zoning denial was motivated solely by neighbors' "irrational prejudice" against the project's intended residents—and this, standing alone, could not supply a valid basis for governmental discrimination. *Id.* at 450.

9

The precise extent of *Cleburne*'s holding is a matter of dispute. It can be read as endorsing a "more searching" form of rational-basis review applicable to laws that "exhibit[] . . . a desire to harm a politically unpopular group."[4] *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring). It has also been interpreted more narrowly to stand for the "uncontroversial proposition" that "majority preferences are not a legitimate reason to treat classes of people differently." *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1057–58 (7th Cir. 2018). Whatever its scope, though, *Cleburne* illustrates that—even under rational-basis review—"courts examine, and sometimes reject, the rationale offered by government for the challenged discrimination." *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014).

## II. Justifications for the Amended Ordinance

With these principles in mind, the court turns to Defendant's justifications for its Amendment. The City essentially offers two rationales in its motion to dismiss: first, that the Amendment helps preserve single-family and two-family neighborhoods in Rockford for family use, and second, that allowing housing for individuals on supervision into these neighborhoods might depress nearby property values.[5] Both of these interests are legitimate on their face. It is well-established that limiting the number of unrelated persons who may live in a dwelling is a permissible use of the zoning power.[6] *See United States v. Village of Palatine*, 37 F.3d 1230,

---

[4] This standard has been variously described as " 'heightened rational-basis review,' or—more colorfully—'rational basis with bite,' 'rational basis with teeth,' or 'rational basis plus.' " *Halgren*, 577 F. Supp. 3d at 752 (citing *Bishop v. Smith*, 760 F.3d 1070, 1099 (10th Cir. 2014) (Holmes, J., concurring)).

[5] The City frames these rationales as three: (1) maintaining the family character of R-1 and R-2 zones, (2) protecting property values in these neighborhoods, and (3) preserving housing stock for families seeking to live in the city. (*See* Mot. at 7–10.) The court notes, however, that the first and third justifications are not meaningfully distinct. If the City had no preference between family and non-family occupants in its low-density residential areas, it would not feel the need to "preserve" housing in these areas for the former.

[6] Plaintiffs dispute this point in passing, citing the traditional principle that "[z]oning is concerned with the use of a piece of land, not with the identity of the person who owns or occupies it." (Pl.'s Opp. [30] at 4.) But this principle is not strictly followed in many jurisdictions

1234 n.1 (7th Cir. 1994) (Manion, J., concurring) (citing *Village of Belle Terre v. Boraas*, 416 U.S. 1 (1974)). And a central purpose of any municipality's zoning code is to "conserve the taxable value of city land." *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 766 (7th Cir. 2003).

The City must also show, however, that the Amendment is a rational means of achieving these ends. *Halgren*, 577 F. Supp. 3d at 737. And its first argument about preserving "family" neighborhood composition runs into the same problem presented in *Cleburne*: it is not clear that this interest is in any way furthered by drawing distinctions based on supervision status. As Plaintiffs point out, the City already prohibits more than three unrelated people from living together as part of the same "household" in most properties located in single- and two-family zones. *See* Rockford, Ill. Zoning Ordinance § 91-046 (defining "family" to include "up to but not exceeding 3 persons not so related"). This generally applicable restriction is undisputedly constitutional, and Plaintiffs are not challenging it here—only the more specific prohibition on two or more individuals on supervision living at the same address in these districts. Both of Plaintiff DNPG's properties, and at least one of Plaintiff Next Step's,[7] are compliant with the three-person limit; if each of these properties' residents "were not [on supervision], but the home was the same in all other respects, its use would be permitted under the city's zoning ordinance." *Cleburne*, 473 U.S. at 449. If the

---

today, and in any event is not determinative as to whether a muncipality's stated justifications for its ordinance survive rational-basis review. *See* 3 Arden H. Rathkopf, Daren A. Rathkopf & Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* § 60:19 & n.13 (4th ed.) (citing cases that refused to apply use/user distinction to "zoning restrictions on household composition in single-family neighborhoods").

[7] According to the Complaint, DNPG owns two properties in R-1 zones in Rockford, one of which, as of February 2024, housed two tenants on supervised release and the other, three such tenants. (Compl. ¶ 19.) Next Step owns three properties in R-1 zones, which respectively housed six, five, and two tenants. Assuming that all of these individuals are unrelated, it is not fully clear whether the first two of Next Step's properties, which appear to exceed the generally applicable three-unrelated-persons "household" limit, would still be out of compliance if the Amendment's "one-per-address" restriction for individuals on supervision were lifted. The Complaint does not address whether these properties have been granted variations or are "nonconforming uses" grandfathered in from prior regulations. *See* Rockford, Ill. Zoning Ordinance §§ 64-001, 80-001-A. Even if they were not, though, Plaintiffs have conceded that they are not challenging the Ordinance's three-unrelated-persons limit.

City's aim is to preserve its R-1 and R-2 zones for "families," it offers no coherent reason why it needs to distinguish between unrelated individuals on supervision and unrelated individuals *not* on supervision to achieve this goal. *See id.* at 450 ("[W]hy this difference warrants a density restriction that others need not observe is not at all apparent.").

That leaves the City's second justification: the purported effects of "group homes for adjustment" on local property values. Unlike its first argument, this one presents at least a coherent theory for singling out individuals on supervision. In Defendant's view, it is "a matter of very rudimentary common sense" that these individuals "present a greater threat to the public's perception of family housing in the City than any other potential set of cohabitating occupants, such that a limitation on their occupancy is a wise protection of Citywide property values in R-1- and R-2-zoned neighborhoods." (Def.'s Reply [33] at 8, 10.) Plaintiffs argue that Defendant has presented no data to back up this point, but the City counters that this misstates its burden at the motion-to-dismiss stage: as it argues, it need only "hypothesize" a rational basis for its policy, and is not required to back this up with concrete proof. *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 771 (7th Cir. 2021) (citing *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008)); *see Roberts v. Village of Shorewood*, No. 00 C 6854, 2002 WL 1331999, at *6 (N.D. Ill. June 17, 2002) (holding that "fears about possible effects on property values . . . cannot be found to be irrational," even if later proved "inaccurate").

As this court reads Seventh Circuit caselaw, however, it does not establish that a defendant subject to rational-basis review can prevail at the motion-to-dismiss stage by offering any "hypothetical" justification for its policy whatsoever. The cases Defendant cites for this proposition stem from *Wroblewski v. City of Washburn*, in which the Seventh Circuit considered the "perplexing situation" that arises when the defendant-friendly standard of rational-basis review under the Equal Protection Clause meets the plaintiff-friendly pleading standard under Rule 12(b)(6). 965 F.2d 452, 459 (7th Cir. 1992). As the *Wroblewski* court held,

> [t]he rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard. The latter standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on an equal protection claim.

*Id.* at 459–60. Thus, while a "presumption of rationality" applies to a defendant's policy at the motion-to-dismiss stage, plaintiffs can overcome this presumption if their well-pleaded facts, taken as true, suggest that "the facts on which the legislature may have relied in shaping the classification could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* at 459 (cleaned up). The Seventh Circuit ultimately affirmed dismissal of the *Wroblewski* plaintiff's claim, but this was because the plaintiff had failed to meet Rule 12(b)(6)'s general pleading standard of alleging facts beyond the mere "conclusionary assertion that the policy is 'without rational basis' "—not because the defendant's hypothetical conjectures automatically trumped the plaintiff's well-pleaded assertions. *Id.* at 460.

While subsequent Seventh Circuit decisions have held that "[s]ince hypothesis is not proof, this test . . . can *often* be applied in advance of discovery," *Flying J Inc.*, 549 F.3d at 546 (emphasis added) (quoting *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005)), the court does not read *Wroblewski* to suggest that this must *always* be the case. Otherwise, every equal protection lawsuit would be resolved at the motion-to-dismiss stage by ruling for the defendant as a matter of law, without the benefit of further discovery to test the merits of their position. In other words, if rational basis review "is not a 'rubber stamp,' " then "there must be a role for actual fact-finding, and it must be possible for a plaintiff to prove facts to overcome the presumption of constitutionality." *Halgren*, 577 F. Supp. 3d at 739 (citing *Pittsfield Dev., LLC v. City of Chicago*, No. 17 C 1951, 2017 WL 5891223, at *10 (N.D. Ill. Nov. 28, 2017)).

In particular, *Cleburne* satisfies this court that more factual development may be warranted in cases, like this one, involving challenges to laws that single out a "politically unpopular group" for disparate treatment. *Cleburne*, 473 U.S. at 447 (citation omitted). On its face, the Amendment applies to all individuals on any form of criminal-justice supervision, including supervised release,

13

probation, and work release. More specifically, legislative history strongly suggests that it was passed as a specific response to IDOC's placement of individuals with sex offense convictions in Rockford's residential neighborhoods. (Compl. Ex. 3 at 3 (comment by Zoning Board of Appeals about potential project that would result in "up to 36 sex offender parolees . . . living on the same block").).

These individuals are undoubtedly a disfavored group, but the City defends its regulation on the claimed basis that any concerns about the potential impacts of such individuals on its neighborhoods are well-founded, unlike the fears of the "harmless group of people" expressed in *Cleburne*. *Milner v. Apfel*, 148 F.3d 812, 817 (7th Cir. 1998). This distinction between people with disabilities and people with criminal records finds at least some support in the caselaw. *Id.* (declining to extend *Cleburne* to invalidate state law denying benefits to individuals acquitted of murder by reason of insanity, on the grounds that "[m]urderers are not harmless people," but are "dangerous, and rationally feared"). But the central holding of *Cleburne* is that a municipality's justification for differential treatment must be based on more than mere "irrational fear" by a "majority of voters." *Id*. (citing *Cleburne*, 473 U.S. at 448–50.) And without the benefit of any empirical data to test whether Plaintiffs' homes have actually hurt property values in Rockford's neighborhoods, it is difficult to discern whether the City's purported concerns are in fact "rational."

Plaintiffs, to the contrary, have alleged that group homes for individuals under supervision pose no meaningful threat to public safety or order.[8] The Complaint asserts that there were no "problems or negative affects [sic] arising from the co-habitation of individuals on [supervised

---

[8] While these allegations do not directly address the City's concerns about property values, the two issues are closely linked. The effects of a given development on local property values depend in key part on the public's perception of that development's impacts on the surrounding area. And although it is of course possible that property values might drop even in the absence of any verifiable impacts, it is harder to characterize such a change as "rational" if it is based on nothing more than preconceived notions about the population served. *See Cleburne*, 473 U.S. at 449 (noting that "mere negative attitudes, or fear . . . are not permissible bases" for differential treatment).

release] in Rockford" before the Amendment's passage. (Compl. ¶ 17.) It also cites evidence that "allowing people on [supervised release] to live in the same building as one another [does not] contribute[] to criminality," and may even have the opposite effect.[9] (*Id.* ¶ 44.) The *Barnes* court cited these same pieces of evidence in finding that the State of Illinois' own "One-Per-Address" statute violated equal protection, even under rational-basis review. *See Barnes*, 529 F. Supp. 3d at 798 (citing findings that "permitting registrants to live together reduces recidivism and improves supervision"). It held, accordingly, that the State had identified "no legitimate government interest, such as public safety or rehabilitation," that could justify the One-Per-Address Statute's restriction on the availability of host sites. *Id.* at 797. The *Barnes* court's factual findings do not directly address the City's purported concern here—whether, setting aside any *actual* risk of recidivism, the *perceived* risk might affect neighborhood property values. But they at least suggest that Plaintiffs have met their burden of alleging sufficient facts to warrant further discovery on the rationality of Defendants' policy. *Cf. Pittsfield Dev.*, 2017 WL 5891223, at *11 (declining to dismiss substantive due process claim based on defendant's "hypothesized, unsubstantiated rational bases surmised entirely without the benefit of fact discovery," where plaintiff's allegations "raise[d] the reasonable inference that the [challenged] Ordinance was arbitrary in nature").

To this effect, at least some other courts have also found zoning restrictions on housing for currently or formerly incarcerated persons lacking in any rational basis. In *Bannum, Inc. v.*

---

[9] The first is a 2003 report from the Minnesota Department of Corrections, which found that housing offenders "in close proximity to one another" offered benefits in the form of "[c]loser supervision" and greater mutual accountability. (*Id*. ¶ 45 (citing Minn. Dep't of Corr., Level Three Sex Offender Residential Placement Issues 4, 8 (Jan. 2023), https://mn.gov/doc/assets/Lvl%203%20SEX%20OFFENDERS%20report%202003%20(revised%202-04)_tcm1089-272828.pdf).) The second is the testimony of a general manager of an Illinois transitional housing program given in the *Barnes* case, stating that "housing registrants at the same address allows for more effective (and cost-effective) law enforcement oversight" and "also allows registrants to police one another and share resources to better support themselves, which ultimately helps them focus on the future and reduces recidivism." (*Id*. ¶ 46 (citing [33] in *Barnes v. Jeffreys*, No. 20 C 2137 (N.D. Ill. July 2, 2020).)

*City of Louisville,* the Sixth Circuit affirmed a summary judgment ruling that a zoning ordinance requiring special-use permits for housing "meant to facilitate the reintegration of federal offenders into society" violated equal protection. 958 F.2d 1354, 1355–56 (6th Cir. 1992). The city argued before the district court that "the occupants of [this housing] are more likely to commit crimes than a person never having been convicted of a crime," but presented "no evidence" in support of this position, and its own expert witness "found that literature on the topic was inconclusive." *Id.* at 1360. Absent "some data reflecting the extent of the danger," the Sixth Circuit found, the district court did not clearly err in finding the city's public-safety justification "so attenuated as to render the distinction arbitrary or irrational." *Id.* at 1361 (citing *Cleburne*, 473 U.S. at 446).

      The Seventh Circuit does not appear to have addressed this question, and at least the Eighth and Eleventh Circuits have come out the other way. *See Bannum, Inc. v. City of St. Charles*, 2 F.3d 267, 272 (8th Cir. 1993) (finding "*Cleburne* . . . inapposite" since "[i]t is not irrational for the City to believe that recidivism could be a problem with some persons served by half-way houses"); *Bannum, Inc. v. City of Fort Lauderdale*, 157 F.3d 819, 823–24 (11th Cir. 1998) (same). What all of these decisions had in common, however, was a more developed factual record than currently exists here. *See City of Louisville*, 958 F.2d at 1356–58 (preliminary injunction and judgment entered after years of litigation over related zoning regulations); *City of St. Charles*, 2 F.3d at 270 (decided at summary judgment); *City of Fort Lauderdale*, 157 F.3d at 822 (same). The same is true of *Cleburne* itself, in which the Supreme Court found the municipal defendant's policy irrational based on a record generated at an initial public hearing and subsequent bench trial. *See Cleburne Living Ctr., Inc. v. City of Cleburne*, 726 F.2d 191, 194 (5th Cir. 1984), *aff'd in part, vacated in part*, 473 U.S. 432 (1985). All of these courts were able to review competing evidence on whether public safety (and by implicit extension, property values) would actually be endangered by siting transitional or supportive housing in residential neighborhoods. Without the benefit of further discovery, this court is ill-equipped to do the same.

16

Before concluding, the court pauses to further address the bearing of *Murphy*, *Barnes*, and other recent challenges to the State of Illinois's residency restrictions for individuals with sex offense convictions on this case. Plaintiffs urge this court to find the City's amended Ordinance suspect for the same reason recognized in this earlier litigation—that it contributes to the prolonged incarceration of indigent prisoners with sex-offense convictions. As they argue, the Amendment "essentially reinstates the One-Per-Address restrictions that have twice been found unconstitutional" in *Barnes* (as to individuals on supervised release) and *Potkaj* (as to individuals on probation). (Pls'. Opp. [30] at 14.)

The court declines this invitation. While *Barnes* and *Potkaj* are relevant to the extent they found "one-per-address" restrictions on individuals serving supervised-release or probation terms for sex offenses unsupported by any verifiable policy concern, they are not binding on this court and do not mandate an equivalent finding as to the ultimate constitutionality of the City's policy. The classification at issue in those cases (between those able to afford compliant host sites and those unable to do so) is distinct from the one presented here (between those under supervision and those not under supervision). Moreover, the state-level restrictions that they invalidated were passed by a different level of government, in response to a different set of policy considerations. That the *State* cannot rationally restrict individuals on supervision from living together at the same address anywhere in Illinois does not answer whether a single *municipality* may rationally pass an equivalent restriction within its own borders. Plaintiffs' concerns are not frivolous: if every municipality in Illinois were to pass an equivalent restriction to Rockford's, the One-Per-Address Statute struck down in *Barnes* and *Potkaj* would be reconstituted as a patchwork quilt, and the State would again struggle to comply with its constitutional mandate of finding suitable host sites for prisoners who have served their terms. But precisely how the State and its subdivisions choose to coordinate compliance with this mandate is an issue of internal governance well beyond the narrow inquiry before this court—whether Rockford, standing alone, has articulated a rational basis for restricting individuals on supervision from living together in its neighborhoods.

17

The court does not answer that question here. It only holds that Plaintiffs have, at this stage in the proceedings, "allege[d] facts sufficient to overcome the presumption of rationality" that applies to the City's Amendment. *St. John's United*, 502 F.3d at 639. Further discovery will help clarify whether the City's concerns about Plaintiffs' properties (and others like them) are grounded in fact. But this discovery will undoubtedly be both intensive and expensive, and the court also encourages the parties to continue negotiating towards a mutually amicable resolution that balances the City's needs with those of Plaintiffs and the State.

## **CONCLUSION**

Defendant's Motion to Dismiss [27] is DENIED.

ENTER:

Dated: September 6, 2024

_____
REBECCA R. PALLMEYER
United States District Judge