**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

DO NOT PASS GO, LLC; *et al*.,

      Plaintiffs,

          v.

CITY OF ROCKFORD,

      Defendant.

3:24-cv-50074

Hon. Rebecca R. Pallmeyer

Magistrate Judge Margaret J. Schneider

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ...............................................................................2

I. The Ordinance ...............................................................................................2

II. The Housing Regulated By the Ordinance.....................................................3

III. The Plaintiffs..................................................................................................4

IV. Mandatory Supervised Release .....................................................................4

V. The Effects of the Ordinance .........................................................................6

ARGUMENT........................................................................................................6

I.   Plaintiffs' Equal Protection Claim Is Subject to Heightened Rational Basis
     Review Under the Animus Inquiry ............................................................... 6

     A.  Rational Basis Review Is Not a Rubber Stamp .................................... 6

     B.  When a Law Targets a Despised Group, Courts Apply a More Searching
         Form of Rational Basis Review ............................................................7

     C. The Animus Inquiry Involves Two Distinct Questions ........................10

         1.  The Facts of this Case Suggest the Presence of Animus ...............10

             a. The Text of the Ordinance ......................................................10

             b. The Context of the Law's Passage ..........................................11

             c. The Legislative History ...........................................................13

             d. The Law's Real-World Effects.................................................14

         2. The City Must Identify a Legitimate Justification That Actually Supports
            the Validity of the Ordinance Based on Evidence  ........................15

II. The Ordinance Does Not Meaningfully Advance the City's Alleged Interests...........17

     A.  The City Has Not Brought Forth Any Evidence that the Ordinance Promotes
         Public Safety . ......................................................................................18

1. Defendant's Own Witnesses Concede Facts Showing That the Ordinance Does Not Promote Public Safety ...................................................20

    a. Kennedy's Admissions ..........................................................20

    b. The City's Admissions ..........................................................22

2. Rockford's Public Safety Justification Erroneously Discounts the High Level of Supervision to which Parolees are Subject......................................24

3. Dr. Kennedy Misrepresents the Evidence and Misunderstands the Scope of the Ordinance ........................................................................28

4. Dr. Kennedy's Political Responsiveness Argument Is Invalid.......................31

B. The City Has Not Brought Forth Reliable Evidence that GHAs Negatively Impact Housing Prices .........................................................................32

   1. Dr. Yeh's Expert Report Is Methodologically Unreliable and Does Not Support the City's Property Value Justification ............................................ 33

    a. Dr. Yeh's Model Omits Standard Controls That Her Own Research Shows Are Essential..........................................................33

    b. Dr. Yeh Never Subjected Her Single Specification to Routine Robustness Checks.................................................................35

    c. Dr. Yeh's Model Fails to Account for the Staggered and Overlapping Nature of GHA Openings in Rockford ...................................36

    d. Dr. Yeh and Dr. Prescott Are Asking Different Questions — and Only One of Them Is the Right Question ........................................37

    e. Even Accepting Dr. Yeh's Flawed Model, Adding One Year of Available Data Eliminates Any Statistically Significant Price Effect .....38

   2. Dr. Yeh's Analysis Cannot Distinguish Between the Effect of a GHA and the Effect of a Single Sex Offender Parolee ..........................................40

   3. Dr. Yeh's Transiency Assumption Is Unsupported, Internally Inconsistent, And Undermined By her Own Prior Research ............................................41

III. Even If It Can Be Shown that Sex Offender Parolees Diminish Property Values, That Does Not Constitute a Valid State Interest to Justify the Ordinance ................44

A. Rockford's Property-Value Justification Is Merely Community Animus with a Price Tag ...............................................................................44

B. Accepting Rockford's Argument Would Nullify the Animus Doctrine in the Land-Use Context ................................................................. 46

C. Rockford Cannot Rehabilitate Its Property-Value Justification by Characterizing It as a Response to Objective Market Data Rather Than Subjective Animus ...............................................................46

IV. The Rationality of this Ordinance Is Undermined by Its Severe Countervailing Costs...............................................................47

A. The Ordinance Dramatically Reduces the Availability of Housing, thereby Promoting Homelessness and Undermining Public Safety ...............................48

B. The Ordinance Imposes a Blanket Parole Condition by Municipal Fiat, Displacing the Individualized Expertise of Parole Officers ...............................49

C. If Permitted, this Ordinance Will Almost Certainly Result in a Cascade of Increasingly Harsh Local Residency Restrictions ...............................51

V. The Ordinance Fails Even Ordinary Rational Basis Review....................................52

A. The City Makes No Effort to Justify the Ordinance for any Category of Supervisee Other Than People Convicted of Sex Offenses............................52

B. The City's Property-Value Theory Does Not Match the Ordinance It Enacted... 53

C. The Ordinance Merely Transfers the Alleged Problems to R-3 and R-4 Zones ..54

CONCLUSION.................................................................55

iv

**INTRODUCTION**

This case challenges the constitutionality of a zoning ordinance enacted by the City of Rockford ("the City") that restricts where people under any form of criminal supervision may reside. The challenged Ordinance defines any address where more than one person on supervision lives as a "Group Home for Adjustment" ("GHA") even when the property is used solely as a residence. The Ordinance prohibits GHAs anywhere in R-1 and R-2 residential districts, and permits them elsewhere only with a special-use permit. SOF ¶¶ 1–9.

Plaintiffs acknowledge that the government may impose reasonable regulations on people with past sex offense convictions. Federal and state laws impose many collateral consequences on this population, and courts have upheld many of those laws as valid efforts to protect the public. *See, e.g., Smith v. Doe*, 538 U.S. 84, 103–04 (2003) (upholding registration requirements); *Vasquez v. Foxx*, 895 F.3d 515 (7th Cir. 2018) (upholding 500-foot residential exclusion zones around daycares).

This case is about the outer limits of that authority. The Constitution still applies to people who are on supervision, including those convicted of sexual offenses, and it forbids the government from imposing special burdens on a disfavored population based on fear, speculation, and public hostility. *See Ortiz v. Breslin*, No. 20-7846, 2022 U.S. LEXIS 767, at *8 (Feb. 22, 2022) (statement of Justice Sotomayor) ("the Constitution protects all people, and it prohibits the deprivation of liberty based solely on speculation and fear" … "[w]hen the political branches fall short in protecting [constitutional] guarantees, the courts must step in."). As the Supreme Court cautioned in *Packingham v. North Carolina*, although legislatures "may pass valid laws to protect children and other victims of sexual assault … the assertion of a valid

governmental interest cannot, in every context, be insulated from all constitutional protections." 582 U.S. 98, 106 (2017) (cleaned up).

In the analysis below, Plaintiffs show that Rockford's Ordinance fails constitutional scrutiny because (1) it singles out a feared and disfavored group for special housing restrictions that do not apply to anyone else; (2) the City has no real-world evidence that GHAs increase crime, recidivism, or reduce property values; and (3) the long-term consequences of upholding the Ordinance are severe, including reducing access to stable housing, displacing individualized supervision decisions from parole officials to municipal officials, politicizing the process of imposing parole conditions, and almost certainly inviting a cascade of copy-cat ordinances.

## FACTUAL BACKGROUND

### I. The Ordinance

Until December 2023, the City of Rockford Zoning Ordinance defined a "Group Home for Adjustment" as "[a] residence for those under court supervision while on probation, pre-release, or work release wherein supervision, rehabilitation and counseling are provided to mainstream residents back into society enabling them to live independently." Statement of Material Facts ("SOF") ¶1.

On December 4, 2023, the Rockford City Council made two changes to the definition of what constitutes a Group Home for Adjustment: it removed the requirement that "supervision, rehabilitation and counseling" be provided on site, and expanded the definition to cover individuals on parole or mandatory supervised release. *Id*. ¶3.[1] The amended definition provides that "any property with multi-unit dwellings shall be considered one residence." *Id.* As a result

---

[1] As amended, the Ordinance defines a GHA as "[a] residence for two or more individuals under supervision while on probation, pre-release, parole, mandatory supervised release, or work release, to mainstream residents back into society enabling them to live independently." *Id*. ¶2.

of these amendments, any address where more than one individual on any kind of criminal supervision resides is defined as a GHA, even if the address is used solely as a residence and even if individuals on supervision are tenants in separate units of a multi-unit building. *Id*. ¶6.

The zoning code categorically prohibits establishment of a GHA in any area of Rockford zoned for single-family or two-family dwellings (R-1 and R-2 zones) and allows establishment of a GHA in multi-family residential zones (R-3 and R-4) or commercial zones (C-1, C-2, C-3, or C-4) only with an approved special use permit. *Id*. ¶7.

In all of its residential districts, Rockford allows up to three unrelated individuals to occupy a residential dwelling unit as a "family" (which the code defines as individuals who "maintain a common household and single housekeeping unit.") *Id*. ¶5. However, due to the Ordinance amendment, individuals on supervision are excluded from residing together as a "family" in R-1 and R-2 zones and only allowed to reside together elsewhere in the City with a special use permit. *Id*. ¶6.

## II. The Housing Regulated By the Ordinance

Two types of housing are affected by the amended Ordinance. One is housing used by the Illinois Department of Corrections' Intensive Community Reintegration Program ("ICRP"). *Id*. ¶10. The ICRP provides housing to individuals being released from prison who are otherwise unable to obtain their own housing at which to live while on Mandatory Supervised Release ("MSR"). *Id*. ¶¶ 10, 11. ICRP housing locations are for residential use only. *Id*. ¶15. Services for ICRP participants—including therapy, case management, vocational training, and employment services—are provided off-site, and the IDOC does not have employees residing on-site at ICRP locations. *Id*. As of June 2025, ICRP housed approximately 380 people across approximately 40

3

addresses throughout Illinois. *Id*. ¶12. IDOC pays contractors on a per-person *per diem* basis to house individuals on MSR in the ICRP. *Id*. ¶11.

The Ordinance also applies to housing that is not subsidized by the IDOC. *Id*. ¶17. For example, a residence where three individuals on MSR live as roommates and pay rent to a landlord is also defined as a GHA. *Id*. ¶14.

In a letter to IDOC, the City of Rockford identified thirteen addresses where more than one individual on MSR was residing in violation of the amended Ordinance. *Id*. ¶19. These properties housed a total of 58 individuals who were subject to the Ordinance. *Id*.

### III.  The Plaintiffs

Plaintiff Next Step Recovery Homes ("NSRH") is an ICRP vendor that operates in several cities in Illinois, including Rockford. As of July 2025, NSRH had six properties in Rockford that could house a total of 24 people. *Id*. ¶13.

Plaintiff Do Not Pass Go ("DNPG") is not an IDOC-contracted vendor, but is instead an entity that offers private-pay housing to individuals on MSR. *Id*. ¶17. DNPG was established in 2020 and currently has three properties, two in Rockford and one in Dixon, Illinois, where it rents to people under supervision. *Id*.

Plaintiff Jason Ridley Jr. resided as a private-pay tenant on the first floor of 326 N. Avon, a property operated by DNPG, while he was on MSR. *Id*. ¶18. He paid $500/month in rent (later $550/month) and shared his residence with two roommates. *Id*. Three additional residents lived in a separate unit on the second floor. *Id*. The City identified both units at 326 N. Avon as being out of compliance with the Ordinance. *Id*.

### IV.   Mandatory Supervised Release

Illinois law vests responsibility for setting the conditions of MSR with the Prisoner Review

Board. *See* 730 ILCS 5/3-3-7(a). Under the Illinois Code of Corrections, the PRB is obligated to impose certain conditions. For example, all persons on MSR must "report to an agent of the Department of Corrections"; "obtain permission … before leaving the State of Illinois"; and "consent to a search of his or her person, property, or residence under his or her control." 730 ILCS 5/3-3-7(a)(1)-(21). Certain conditions of MSR, such as completing a program of sex offender therapy, GPS monitoring, and consenting to searches of all internet-capable devices, are mandatory for persons with sex offense convictions. 730 ILCS 5/3-3-7(a)(7.5)-(7.13).

The PRB has discretion to impose other conditions of MSR based on an "individualized assessment" of the parolee's risk and needs. 730 ILCS 5/3-3-7(b), (b-1); 730 ILCS 5/3-14-2. These discretionary conditions may include, among other things, that the parolee "work or pursue a course of study or vocational training"; "undergo medical or psychiatric treatment"; or "refrain from entering into a designated geographic area." 730 ILCS 5/3-3-7(b), (b-1). Parole agents also have the authority to impose rules "that are consistent with furthering ... the goals and objectives of his or her parole or mandatory supervised release or to protect the public" and may modify such instructions "at any time, as the agent deems appropriate." 730 ILCS 5/3-3-7(a)(15).

Individuals with sex offense convictions must have an approved place to live before they can be released from IDOC custody onto MSR. That approved residence is called a "host site," and IDOC conducts a host-site investigation before an individual is released or transferred to a particular address. SOF ¶ 22. For people with sex offense convictions, the locations of approved host sites are substantially restricted by state law: an individual classified as child sex offender may not reside within 500 feet of schools, playgrounds, daycares, facilities serving children, or the victim of the offense; and individuals on MSR for sex offenses may not reside near places

5

where minor children congregate unless they receive advance approval from IDOC. *Id*. ¶¶ 20–21. If a person with a sex offense conviction cannot secure an approved host site, the person remains in custody even after completing the prison portion of their sentence. *Id*. ¶¶ 23–25.

The Code of Corrections provides that a person on MSR may not "knowingly associate with other persons on parole or mandatory supervised release without prior written permission of his or her parole agent," while expressly permitting associations involving "community programs, worship services, volunteering, engaging families, or some other pro-social activity in which there is no evidence of criminal intent." SOF ¶ 33. In practice, parole agents approve many pro-social associations among parolees, including group therapy, jobs, support groups, and shared housing. *Id*. ¶ 34. At the same time, parole agents retain discretion to prohibit particular associations that pose an individualized risk, including contact with former co-offenders, gang associates, or other individuals whose involvement would increase re-offense risk. *Id*.

## V. The Effects of the Ordinance

The Ordinance would drastically limit the availability of compliant housing in Rockford for individuals on MSR. All eleven ICRP vendors in Illinois currently house more than one person on supervision at the same address. *Id*. ¶28. The Ordinance would not only make it impossible for the ICRP to operate in Rockford, it would also override IDOC parole agents' authority to make supervision decisions about where and with whom an individual should live while on MSR. *Id*. ¶¶ 30, 33–34, 41, 146

## ARGUMENT

## I. Plaintiffs' Equal Protection Claim Is Subject to Heightened Rational Basis Review Under the Animus Inquiry

### A. Rational Basis Review Is Not a Rubber Stamp

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

6

"deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Its essential directive is that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Because the City of Rockford does not target a suspect class and no fundamental right is directly implicated, this Court reviews the Ordinance under the rational basis standard. *See id.* at 440.

Under ordinary rational basis review, a law is presumed constitutional and will be sustained if the classification it draws is rationally related to a legitimate governmental interest. *Cleburne,* 473 U.S. at 440. The standard is deliberately permissive. Legislatures need not produce empirical evidence that a harm exists or is likely to occur; they may act prophylactically, anticipating problems before they materialize. *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993).

That said, rational basis review is not a rubber stamp. "[T]he standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe,* 509 U.S. 312, 321 (1993). A court must still identify a genuine connection between the classification and an asserted objective; it "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne,* 473 U.S. at 446. The rational basis inquiry thus guards against government action that is arbitrary or lacks any legitimate purpose, *Halgren v. City of Naperville,* 577 F. Supp. 3d 700, 723 (N.D. Ill. 2021), and the "[s]earch for the link between classification and objective gives substance to the Equal Protection Clause." *Romer v. Evans,* 517 U.S. 620, 632 (1996).

## B. When a Law Targets a Despised Group, Courts Apply a More Searching Form of Rational Basis Review

The Supreme Court has long recognized that rational basis review requires special vigilance when the government singles out a politically unpopular group. This heightened attention— sometimes called "rational basis with bite"—reflects a straightforward insight: because

7

legislatures are always free to hypothesize a legitimate rationale after the fact, there is a risk that naked hostility will masquerade as public policy when the targeted group commands little popular sympathy. *See Cleburne,* 473 U.S. at 448; *Romer,* 517 U.S. at 634–35.

The canonical statement of this principle appears in *Cleburne*, where the Supreme Court struck down a special-use permit requirement applied to a group home for people with intellectual disabilities. The Court held that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases" for treating one group differently from others. *Cleburne,* 473 U.S. at 448. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Id.* (*quoting Palmore v. Sidoti,* 466 U.S. 429, 433 (1984)). And because one of the vital purposes of the Constitution is to protect the rights of minorities that are politically powerless to protect themselves, the Court refused to accept legislative hostility as a legitimate governmental interest. *Cleburne,* 473 U.S. at 440.

The same principle animated *U.S. Dep't of Agriculture v. Moreno,* 413 U.S. 528 (1973), where the Supreme Court invalidated a provision of the Food Stamp Act that excluded households containing unrelated persons. The Court explained that "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* at 534.

In *Romer v. Evans,* 517 U.S. 620 (1996), the Supreme Court applied the same mode of analysis even where the targeting was partially disguised. Colorado's Amendment 2 was framed in neutral terms, and the state defended it as simply "put[ting] gays and lesbians in the same position as all other persons." 517 U.S. at 626. The Court was not deceived. Looking to the

8

breadth of the enactment, the implausibility of the proffered justifications, and the evident relationship between the law and animus toward the targeted class, the Court struck it down, holding that a law that "inflicts on [a disfavored class] immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it" cannot be upheld. *Id*. at 635. The lesson of *Romer* is that legislative packaging does not determine constitutional validity; a court must look through form to substance.

The Sixth Circuit applied this logic in a case strikingly similar to the one at issue in this case. In *Bannum, Inc. v. City of Louisville,* 958 F.2d 1354 (6th Cir. 1992), the Sixth Circuit struck down a zoning ordinance that restricted the placement of halfway houses in residential areas, finding that where a city offers no evidence linking its ordinance to any actual harm, and where the class targeted is one the community simply does not want nearby, the ordinance fails even deferential rational basis review. *Id.* at 1363.

The reason courts apply heightened scrutiny in these circumstances is not to abandon deference to legislative judgments, but to ensure that deference does not become a license for prejudice. When the government targets a group defined by characteristics that inspire fear or revulsion—and when the asserted justifications are thin, borrowed from unrelated contexts, or demonstrably disconnected from the challenged enactment—courts have both the authority and the obligation to look more carefully. *See Cleburne,* 473 U.S. at 448–50; *Romer,* 517 U.S. at 634–35.[2]

---

[2] Legal scholars have shown that the prohibition against the government acting out of hostility toward a politically unpopular group has deep roots in the constitutional order, tracing back to the Framers' concerns about faction and class legislation. *See* William Araiza, *Animus: A Short Introduction to Bias in the Law* (2017) at 11–28 (tracing the animus doctrine back to James Madison's warnings in Federalist No. 10 about factions "who are united and actuated by some common impulse of passion, or of interest, adverse to the rights of other citizens."). Professor Cass Sunstein has observed that one of the most enduring themes running through the Constitution is the prohibition of what he calls "naked preferences"—*i.e.*, governmental decisions that distribute burdens or benefits to one group rather than

### C.  The Animus Inquiry Involves Two Distinct Questions

The animus inquiry involves two distinct questions: (i) how does a plaintiff demonstrate that the animus inquiry should even be invoked—*i.e.*, that the challenged law warrants more searching review?; and (ii) once invoked, how does a plaintiff prove that animus, rather than a legitimate governmental interest, drove the enactment? Plaintiffs address each question in turn.

### 1.  The Facts of this Case Suggest the Presence of Animus

There is not a precise test to determine whether animus is behind the passage of a particular law. However, as Professor Dale Carpenter has observed, in *Moreno*, *Cleburne*, *Romer*, and *Windsor*, the Court has identified several broad categories of evidence that are relevant to the animus inquiry.[3] As shown below, the evidence points to the conclusion that animus motivated the passage of the Ordinance.

### a.  The Text of the Ordinance

As Carpenter observes, the Supreme Court has consistently looked first to the statutory text in evaluating animus claims, asking whether the law singles out a particular group for adverse treatment. Carpenter at 599-600. In *Romer*, for example, the Court found it significant that Colorado's Amendment 2 was "sweeping and comprehensive" in its adverse treatment of a single group, placing them "in a solitary class." *Romer*, 517 U.S. at 627.

---

another "solely on the ground that those favored have exercised the raw political power to obtain what they want." Cass R. Sunstein, *Naked Preferences and the Constitution*, 84 Colum. L. Rev. 1689, 1689 (1984). Legal scholar Dale Carpenter has observed that the anti-animus principle exists precisely because "the political process is not self-correcting" when the target of majoritarian hostility is a politically powerless group. Dale Carpenter, *The Dead End of Animus Doctrine*, 74 Ala. L. Rev. 585, 589-90 (2023).

[3]   *See* Carpenter, *supra*, at 589-90 (2023). Synthesizing the factors from the Court's decisions in *Moreno*, *Cleburne*, *Romer*, and *Windsor*, Professor Carpenter identified five categories of evidence relevant to the animus inquiry: (1) the statutory text; (2) the political and legal context of the law's passage; (3) the legislative proceedings and history; (4) the law's real-world effects; and (5) the failure of alternative, non-animus-based explanations to account for the law. *Id.* at 599. As shown below, these factors points unmistakably toward animus in this case.

Here, by its plain terms, the Ordinance singles out individuals under supervision for adverse treatment. It defines a "group home for adjustment" as any address at which more than one individual on probation, pre-release, parole, mandatory supervised release, or work release resides. SOF ¶ 2. No other group of residents is subjected to comparable restrictions. A landlord may rent to groups of college students, recovering alcoholics, recent immigrants, or formerly homeless individuals without obtaining a special use permit. *Id*. ¶¶ 5-6. Only persons who are under some form of supervision trigger the Ordinance's requirements.

The December 2023 amendment made the targeting of persons under supervision even more explicit. The original ordinance, which defined "group homes" as places where "supervision, rehabilitation and counseling," are provided (SOF ¶ 1) at least had some connection to the regulatory purpose of overseeing residential treatment facilities. The amended ordinance deleted that requirement entirely, making clear that the City's concern is not with the provision of services but with the mere presence of persons on supervision in residential neighborhoods. This deliberate expansion of the Ordinance's reach—stripping away any use-based justification and replacing it with a pure status-based restriction—is powerful textual evidence that the Ordinance's purpose is not regulatory but exclusionary.

### b. The Context of the Law's Passage

The Supreme Court's animus cases look not only to the text of the challenged law, but also to the legal and political context in which it was enacted. Context can expose whether the asserted rationale is ordinary and coherent, or whether the law is singling out a politically unpopular group in an unusual way. In *Windsor*, for example, the Court found it significant that the challenged statute departed sharply from the federal government's usual practice of accepting state-law definitions of marriage. *U.S. v. Windsor*, 570 U.S. 744, 770 (2013) (noting that the

Defense of Marriage Act was an "unusual deviation from the usual tradition"). And in *Cleburne*, the Court found it significant that the City singled out a home for people with intellectual disabilities for special permitting, even though there was no basis to believe that it would affect the City's legitimate interests differently from the living arrangements of other groups which were allowed without a permit. 473 U.S. at 448–50.

Here, as in *Windsor* and *Cleburne*, the context suggests the Ordinance is rooted in animus. Most significantly, the Ordinance is unlike traditional zoning ordinances in that it does not regulate the use of land; it regulates the identity of occupants. Zoning law has a well-understood function: it regulates the physical character of land use—density, building height, setbacks, the types of activities that may occur on a parcel—in order to promote orderly development, manage neighborhood character, and protect public health and safety. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926). Zoning laws do not ordinarily regulate who may live in a dwelling. *See* Arden H. Rathkopf, *The Law of Zoning and Planning*, § 60.19 (2005) ("zoning deals with land use, not the owner, operator, or occupant of the land"). An ordinance that bars more than one person under any form of supervision from living at a given address is not a land-use ordinance in any meaningful sense. It is a status ordinance—one that restricts the housing options of a defined group of persons based entirely on who they are rather than how they plan to use the residence.

The parallel to *Cleburne* is straightforward. There, the City required a special-use permit for a group home for people with intellectual disabilities, while allowing other group-living arrangements—such as apartment houses, fraternity and sorority houses, hospitals, and nursing homes—without the same requirement. 473 U.S. at 447–48. The Supreme Court looked past the zoning label and found that the differential treatment could not be explained by the property's

12

physical use, but only by the identity of the people who would live there: "The short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded." *Id*. at 450.

Rockford's Ordinance draws the same kind of distinction. Its ban on more than one person on supervised release living at the same address in R-1 and R-2 districts is not tied to density, occupancy, building safety, traffic, noise, or any other land-use characteristic. A household of three unrelated people with felony convictions who have completed their sentences is permitted. So is a household of three registered sex offenders who are not on any criminal supervision. But two people on supervision may not live together even if IDOC has approved the residence for both of them and all that they do on the property is sleep, eat, and watch television. The operative distinction is not the use of the property, but the legal status of the people who live there.[4]

###    c.    The Legislative History

The Supreme Court has also found statements by policymakers relevant to determine whether an animus inquiry is appropriate. In *Moreno*, for example, the Court noted that the legislative history contained an explicit statement by a congressman that the amendment's purpose was to prevent "hippies" from obtaining food stamps—leaving nothing to inference. *Moreno*, 413 U.S. at 534. In *Cleburne*, the City admitted that its demand for a special-use permit for the group home—a requirement not imposed on comparable facilities—was driven by neighbors' objections to the presence of people with intellectual disabilities, not by any neutral land-use

---

[4]    Rockford's 30(b)(6) witness, Todd Cagnoni, attempted to characterize the Ordinance as a regulation of "use," but conceded that a property qualifies as a "group home for adjustment" if two people under supervision live there even if all they're using the property for is as a residence. SOF ¶ 6. And when asked whether any other restrictions on property use in residential areas depend on the "identity or status of the person who occupies the property as opposed to what they do on that property," Mr. Cagnoni could identify none; he simply repeated that the City "regulate[s] property by use." *Id*. ¶ 9. That circular label does not change the operative fact that the Ordinance is triggered by who lives in the home, not by any activity occurring there.

principle. *Cleburne*, 473 U.S. at 448–50.

Here too, the legislative history of the Ordinance is candid about the City's true purpose—namely, to limit individuals convicted of sex offenses from living in residential areas in Rockford. The Rockford Planning and Zoning Committee Report from the November 21, 2023, meeting states plainly that the Ordinance was enacted in response to a perceived "influx of sex offender parolees" being released from IDOC to Rockford. SOF ¶ 55.  The City's Legal Director, Nicholas Meyer, testified before the Committee that the amendment was prompted by "a number of individuals [having] been released to the Rockford area from prison on mandatory supervised release," many of whom "are from outside of Winnebago County." *Id*. ¶ 56. The City's 30(b)(6) witness, Todd Cagnoni, candidly admitted that the City took into account "public perception" of people who are on parole and people who have been convicted of sex offenses when enacting the Ordinance. *Id*. ¶ 59.

This is relevant because sex offenders (parolees or otherwise) are by common acknowledgment among the most socially stigmatized groups in American life. *See Barnes v. Jeffreys,* 529 F. Supp. 3d 784, 799 (N.D. Ill. 2021) (observing that "few groups face the degree of social stigma and community hostility directed at sex offenders"); *Does 1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016) (explaining that people who have been convicted of sex offenses are "widely feared and disdained.")

### d.  The Law's Real-World Effects

As Carpenter explains, courts also look to a law's "harsh real-world effects, from which an animus-based purpose can be inferred," as one of the key indicators of unconstitutional motivation. Carpenter, *supra*, at 599. As the Court observed in *Romer*, when a law imposes

14

"immediate, continuing, and real injuries" on a disfavored group that are not simply "incidental" to the law's operation, the inference of animus is difficult to resist. *Romer*, 517 U.S. at 635.

Here, the real-world effects of the Rockford ordinance confirm its animus-based character. At the time the complaint was filed, at least 58 persons on MSR residing in Rockford faced immediate displacement from their homes. SOF ¶ 19. The Corporate Plaintiffs face the impossible choice of evicting their tenants or paying a fine of $50 to $500 per violation per day. *Id*. ¶ 8. The individuals subject to the Ordinance face homelessness and return to prison if they cannot find alternative housing that complies with both the Ordinance and the many other restrictions that apply to persons on MSR. *Id*. ¶¶ 23–30, 138, 141.

In conclusion, the record leaves no doubt about the City's true motivation for the Ordinance. City officials amended the zoning code in explicit response to what they described as a perceived "influx of sex offender parolees" being released from the IDOC to Rockford. No evidence of harm was presented. No study was cited. No public safety justification was offered. The Ordinance was enacted because individuals convicted of sex offenses are politically unpopular. The targeting of this particular group compels the more searching rational basis inquiry.

> **2. The City Must Identify a Legitimate Justification That Actually Supports the Validity of the Ordinance Based on Evidence**

Once animus is shown to be a motivating force behind a law, the constitutional inquiry does not end. The government may still defend the law by identifying a legitimate, non-animus-based purpose that independently explains the challenged classification. But that is not the same as ordinary rational basis review, under which courts may hypothesize conceivable justifications after the fact. When the record supports an inference of animus, the question is whether the law can "reasonably be understood to result from a justification independent of unconstitutional grounds." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018).

15

That inquiry requires a real connection between the government's asserted purpose and the line the law draws. As Professor Sunstein has explained, a law cannot be justified by a mere invocation of a government interest; there must be a "plausible connection" between the asserted interest and the measure under review. Sunstein, *supra*, 1696–97. Where the asserted justification does not plausibly explain the challenged classification the justification is "illusory," and the inference that the law rests on a bare desire to disadvantage the targeted group becomes difficult to avoid. *Id*. Importantly, the inquiry is not whether a plausible rationale can be articulated in the abstract, but whether the evidence actually before the Court—including the City's own admissions—supports a genuine connection between the Ordinance and a legitimate public purpose. *See Cleburne*, 473 U.S. at 448–50; *Romer*, 517 U.S. at 635.

*Cleburne* is the clearest example of how the Supreme Court applies this analysis. The City there invoked familiar zoning concerns to justify the ordinance—neighborhood opposition, traffic, density, and proximity to other facilities. But the Court did not simply accept those interests at face value. It asked whether they actually explained the decision to require a special-use permit for a home for people with intellectual disabilities when other comparable group-living arrangements were permitted without one. 473 U.S. at 448–50. Because the asserted concerns applied with equal or greater force to uses the City allowed without a permit, the Court concluded that the permit requirement appeared to rest not on a legitimate land-use distinction, but on "irrational prejudice" against the people who would live in the group home. *Id.* at 450. Professor Carpenter's analysis of *Cleburne* illuminates why such ordinances cannot survive constitutional scrutiny. Carpenter observes that the *Cleburne* Court found animus in the permitting requirement because the city's stated justifications were "strained efforts to allow it to act on prejudice and fears" of the disfavored group, none of which explained why the group

16

home should be treated differently from other multi-unit dwellings. Carpenter, *supra*, at 593-94.

The same analysis applies here. Rockford may not save the Ordinance by invoking public safety, neighborhood stability, or property values in the abstract. It must show that those interests actually explain the Ordinance's operative distinction: two people under supervision may not live together in an R-1 or R-2 residence, while other residential households that present the same alleged land-use impacts are allowed. As in *Cleburne*, the mismatch between the City's asserted interests and the Ordinance's actual reach shows that the law is not a neutral land-use regulation. It is a status-based restriction enacted in response to hostility toward an unpopular group.

## II. The Ordinance Does Not Meaningfully Advance the City's Alleged Interests

Rockford's rationale for the Ordinance has been a moving target. At the time of passage, the sole justification was to address a perceived "influx of sex offender parolees" being released from IDOC to Rockford. SOF ¶¶53–56. No official identified any specific harm caused by persons on criminal supervision residing together in Rockford. No study was cited. No evidence of any concrete harm was presented.

Then, at the motion-to-dismiss stage, Defendant offered three justifications for the Ordinance—preserving the character of single-and-two-family housing zones; protecting property values; and protecting the housing stock available to families, (ECF 27, Rockford's MTD, at 9-10), at the same time asserting that under rational basis review Rockford's justifications need not be factually accurate (*id*. at 9 ("fears about effects on property values … may [even] be[] inaccurate, but they cannot be found to be irrational")) and need only be conceivable (*id*. at 11 ("it simply does not matter if the ordinance at issue actually achieves a basis advanced. It only matters that one could conceive a world in which the challenged ordinance furthers some hypothetical rational basis.")).

17

Then, in the City's answers to interrogatories and testimony of its 30(b)(6) witness,

Defendant offered an array of justifications for the Ordinance, including the following:

1. Keeps single- and two-family dwellings in the hands of families;
2. Helps raise or maintain property values in R-1 and R-2 neighborhoods;
3. Ensures housing stock for families seeking to buy in the City is protected and not usurped by corporate interests seeking to profit off nonfamilial use;
4. Protects and promotes public health, safety, and general welfare;
5. Enhances residents' quality of life;
6. Protects the character of established residential neighborhoods;
7. Promotes the peace, quiet, and enjoyment of residential areas;
8. Maintains orderly and compatible development patterns that promote an appropriate mix of land uses;
9. Maintains a range of housing choices and options; and
10. Accommodates the orderly and beneficial development of all parts of the City.

SOF ¶ 57.

In the end, Rockford settled on two justifications for its Ordinance: (1) the preservation of

public safety; and (2) the prevention of diminishment of property values. SOF ¶ 58. Neither

holds up to scrutiny.

### A. The City Has Not Brought Forth Any Evidence that the Ordinance Promotes Public Safety

The City justifies the Ordinance on public safety grounds. The argument is that sex offender

parolees are dangerous criminals and that the City is justified in attempting to reduce the risks

they present by prohibiting them from living together in residential areas designated as R-1 and

R-2 zones. In support, the City retained Dr. Daniel Kennedy, Ph.D., a Professor Emeritus of

Criminal Justice at the University of Detroit and a Certified Clinical Sociologist who worked as a

probation officer in the 1960s and 70s. SOF ¶ 61. Dr. Kennedy defends the Ordinance on several

grounds.

First, he takes what can only be described as a take-no-prisoners approach to the dangers

presented by individuals convicted of sex offenses. In his expert report, Dr. Kennedy

18

characterizes the residents of Rockford's GHAs as drawn from a prison population consisting of "psychopaths," "persons diagnosable with Antisocial Personality Disorder," and sex offenders who are "simply unwilling or unable to control their impulses" — including, he emphasizes, "the mysoped who derives a sexually sadistic thrill from the murder of children." SOF ¶62.[5] Dr. Kennedy invokes the specter of John Wayne Gacy to illustrate why buffer zones cannot be trusted, and the Columbine massacre to explain the dangers of co-offending. *Id*. In his deposition, he was equally hyperbolic, explaining that the proper manner of supervision of individuals convicted of sex offenses who are on MSR is something akin to civil commitment— supervisees should "maybe" be given "the run of a hospital." *Id*. ¶ 64.

In addition, he points to what he characterizes as the high recidivism rates of parolees generally—citing Sarah Brown-Foiles' paper for the proposition that "between 65% and 75% of individuals exiting prison will return," and sex offender parolees specifically, arguing that because sex offenses are underreported, the "true" recidivism rate of sex offenders is far higher than official statistics suggest. SOF ¶¶ 87–90, 96–103.

Finally, Dr. Kennedy argues that the community's fear and disgust, whether or not grounded in fact, itself justifies the Ordinance as an expression of democratic will. He makes two arguments in support: one, it is proper for politicians to pass legislation based on the community's fears; and two, "perception is reality," explaining that even if crime does not actually increase near a GHA, the community's belief that it will causes real consequences for people's feelings of safety and property values, and that is sufficient justification for the Ordinance. *Id.* ¶¶65–66. As shown below, none of these justifications are valid.

---

[5]    A "mysoped" is a term from criminology referring to an "exceedingly rare" category of child sex offender—one who is motivated primarily by sadism toward children. Jerrod Brown, *Mysopeds: A need for Increased Awareness, Understanding, and Training*, Forensic Scholars Today, Vol. 3, Iss. 2 (2017).

1. **Defendant's Own Witnesses Concede Facts Showing That the Ordinance Does Not Promote Public Safety**

a. **Kennedy's Admissions**

Dr. Kennedy's deposition is a cascade of concessions which undermine any claim that the Ordinance is necessary to protect public safety.

For starters, the strongest evidence that the ordinance promotes public safety would be empirical evidence, but Dr. Kennedy admitted repeatedly that the City has no evidence that any harms to public safety actually occurred in Rockford as a result of more than one sex offender living in a residential property, including any increase in crime. SOF ¶ 68 (agreeing that he has "not identified any evidence that there has been an actual increase in crime in Rockford as a result of persons on parole residing together.") Relatedly, Dr. Kennedy admitted that he cannot say the Ordinance is effective for purposes of promoting public safety. SOF ¶ 70 ("I haven't done any formal evaluation of its efficacy."). In short, Dr. Kennedy could not point to a single study, a single data point, or a single real-world example establishing that Rockford's Ordinance banning more than one person on supervision from sharing a residence in R-1 and R-2 zones reduces crime, reduces recidivism, or advances public safety. The criminological case for this Ordinance, by Dr. Kennedy's own admission, does not exist.[6]

In addition, Dr. Kennedy claims that allowing multiple supervised individuals to reside together may increase the risk of sexual offending by increasing the risk of co-offending. SOF ¶71. By "co-offending," Dr. Kennedy is referring to the idea that offenders who live near one another may mutually reinforce criminal impulses, share techniques for avoiding apprehension,

---

[6] It should be noted that the work of Rockford's other expert, Dr. Susan Yeh, confirms that actual sex crime risk does not increase after an offender moves into a community. *See* Ex. 31, Susan Yeh, *Revealing the rapist next door: Property impacts of a sex offender registry*, Int'l Rev. L. & Econ. (2015) at 43 ("while house prices suggest fear of or distaste for high-risk sex offenders, sex crime risk is not higher after an offender moves in.")

and recruit one another into criminal activity. *Id*. Dr. Kennedy admits, however, that he is unaware of any actual co-offending by individuals who reside together in Rockford. SOF ¶¶71–72. Thus, the alleged risk of co-offending is based on mere speculation. In other words, Dr. Kennedy admits that, while the crux of the City's public safety justification for the Ordinance is that allowing cohabitation among parolees promotes recidivism, he has no empirical proof of this happening and that his co-offending theory is only an inference rather than an empirically validated conclusion. Under *Cleburne* and its progeny, an inference untethered to evidence about the actual population being regulated does not constitute a legitimate governmental interest.[7]

Dr. Kennedy also conceded that restrictions that limit access to housing, like the Ordinance at issue, may increase rather than decrease risk factors for reoffense. SOF ¶ 139 (acknowledging that stable housing is a protective factor that reduces the risk of recidivism, and that homelessness and housing instability are risk factors that increase the risk of recidivism). Relatedly, Dr. Kennedy admitted he is not aware of any empirical studies that establish residency restrictions regulating where individuals convicted of sex offenses may reside reduce crime. *Id.*

Finally, Dr. Kennedy confirmed that he is not aware of any other municipality in the country that has enacted a similar law to Rockford's. SOF ¶ 69. The complete absence of any comparable

---

[7] Moreover, as explained by Dr. Socia in his rebuttal expert report, Dr. Kennedy, in justifying the Ordinance based on the possibility that GHAs may promote co-offending among persons convicted of sexual offenses, ignores relevant social science research in at least four ways: (1) the research does not support the conclusion that parolees living together have an increased risk of reoffending. The handful of studies that have specifically examined outcomes for parolees who live together in the same home suggest that shared housing may reduce, rather than increase, recidivism risk (SOF ¶ 74); (2) sexual offending is among the *least* likely crime categories to involve co-offending (SOF ¶ 79); (3) sexual offenses, particularly those against children, most commonly occur within existing social or familial relationships, not among strangers or opportunistic co-offenders. (*id*.); and (4) Dr. Kennedy's reliance on criminological theories (Situational Crime Prevention and Routine Activities Theory) to support the co-offending risk does not actually support his conclusion (*id*. ¶¶ 77, 78). Properly understood, neither theory predicts increased offending risk from supervised individuals sharing housing. To the contrary, Situational Crime Prevention would counsel supervision and monitoring, which is exactly what GHA residents have through their parole conditions and living arrangements. *Id.* ¶78.

law anywhere in the country is powerful evidence that the Ordinance is not a rational response to a genuine public safety concern, but rather an anomalous political response to community animus—precisely what *Cleburne* forbids.

### b. The City's Admissions

Rockford's 30(b)(6) witness Todd Cagnoni also made significant concessions that undercut Rockford's claim that the Ordinance is necessary to protect public safety.

Cagnoni could not identify any evidence that shared housing has harmed public safety in Rockford. He testified that the City did not undertake any analysis of whether people on supervision living in Rockford caused an increase in crime. SOF ¶ 83. He could not identify any crime that had occurred as a result of more than one person on supervision living together during the more than two-year period that the Ordinance has been stayed. *Id.* ¶ 84.

Cagnoni testified that the City is aware of various "studies" regarding recidivism, but when asked what evidence the City had that negative effects identified in outside studies had actually occurred in Rockford, Cagnoni answered: "I don't have any specific thing that I can point at." SOF ¶ 85. In other words, the City's position is not that parolees living together in Rockford have caused crime; it is based on what the City thinks "may occur." *Id.*

Cagnoni also admitted that the City has no evidence that cohabitation itself is criminogenic. SOF ¶ 60. He agreed that it was "fair" to say that the City's contention is not that "residing in the same dwelling," increases risk, but only that "more people on supervision raises the overall risk that someone will commit a new criminal offense." *Id*. Cagnoni admitted that the City has no basis to believe the likelihood of reoffense is higher whether people under supervision live

together in the same dwelling as opposed to on same block in separate housing. *Id*.[8]

This illustrates that the Ordinance is a poor fit for the public safety goals the City contends it was enacted to serve. Rockford's Ordinance does not limit the total number of parolees who may live on the same block, in the same neighborhood, or near one another. It only prohibits two people under supervision from sharing a home in R-1 and R-2 districts, while allowing those same people to live next door to one another in separate homes. SOF ¶¶ 6–7, 60. If the risk is simply the number of supervised people in an area, the Ordinance does not address that risk. If the claimed risk is cohabitation, the City has no evidence that cohabitation increases crime.

The City's only concrete example of the harms it alleges the Ordinance was intended to address confirms the point. The Planning & Zoning Report identified three four-unit buildings on 19th Avenue where up to three parolees lived in each unit, creating what the City described as the possibility of "up to 36 sex offender parolees" living on the same block. SOF ¶ 55. But the record does not identify any crimes or other actual harm arising from the parolees residing at those properties. The only problem the City identified was the concentration of people under supervision. Concentration alone cannot justify the Ordinance, particularly where Rockford's own witness conceded the Ordinance does not actually regulate the number of people under supervision who may live in a given neighborhood.

Finally, Cagnoni admitted that Rockford took account of public perception of parolees and people with sex offense convictions when enacting the Ordinance. SOF ¶ 59. He testified that the City considered not only actual risk, but perceived risk, including the perception that people on supervised release pose a danger and that this perception may affect property values. *Id*. But, as

---

[8] Indeed, a study Dr. Socia conducted in 2013 examined neighborhood-level spatial distributions of registered sex offenders, and found that how close offenders lived to each other was not significantly associated with the likelihood of recidivistic sexual offending. SOF ¶ 73.

explained, under *Cleburne* a municipality cannot convert public fear into a zoning exclusion without evidence that the excluded group is actually causing the harms asserted. Here, Rockford's own 30(b)(6) testimony confirms that the Ordinance rests on predictive assumptions, perceived risk, and fear rather than evidence that the prohibited housing arrangement has caused any public-safety problems in Rockford.

Taken together, the admissions by the City's expert criminologist and 30(b)(6) witness firmly establish the absence of a public safety rationale for the Ordinance. The City enacted the Ordinance without empirical evidence that GHAs caused any harm in Rockford, much less that allowing individuals on supervision to reside together increases crime.

### 2. Rockford's Public Safety Justification Erroneously Discounts the High Level of Supervision to which Parolees are Subject

One focus of Rockford's public safety argument is Dr. Kennedy's assertion that sex offender parolees present "a threat to society" that justifies restricting their ability to live together in R-1 and R-2 zones. SOF ¶ 62. The argument fails because the evidence shows that the high level of supervision to which parolees are subject serves to effectively protect the community. To be sure, Dr. Kennedy discounts the degree of supervision to which sex offender parolees are subject, but his critique, as shown below, is without foundation.

It is true that courts generally accept that parolees present a higher risk of crime than members of the general public. *See Samson v. California*, 547 U.S. 843, 849 (2006) (observing that "by virtue of his status, a probationer [or parolee] is more likely than the ordinary citizen to violate the law.") But Rockford's argument ignores something critical: the entire architecture of criminal supervision is structured around the presumed elevated risk of individuals released onto MSR, and it meets this risk head-on in two ways that Rockford's argument disregards.

First, supervision radically abrogates a parolee's privacy rights, transforming them into one

24

of the most closely monitored classes of persons in American society. The Supreme Court has held that supervision of probationers and parolees is a "special need" of the state permitting a "degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Griffin v. Wisconsin*, 483 U.S. 868, 875 (1987)). In *Griffin*, the Court upheld the warrantless search of a probationer's home because it was conducted pursuant to a valid regulation governing probationers. 483 U.S. at 880. The Court built upon this principle in *U.S. v. Knights*, 534 U.S. 112, 119 (2001) ("probationers do not enjoy the absolute liberty to which every citizen is entitled.") (citations omitted), and then in *Samson* held that even suspicionless searches of parolees are permissible under the Fourth Amendment. 547 U.S. at 852 ("parolees like petitioner have severely diminished expectations of privacy by virtue of their status alone.") These cases establish that parolees occupy a constitutional category of dramatically reduced privacy—a category that exists precisely because the state has accepted the responsibility of managing their elevated risk through intensive oversight.

Second, and more concretely, the supervision to which sex offender parolees in Illinois are subject is extraordinarily intensive and far more comprehensive than Dr. Kennedy acknowledges. Dion Dixon, the former Deputy Chief of the IDOC Parole Division and former Commander of the District 1 Sex Offender Supervision Unit, explains in detail the layers of oversight imposed on sex offender parolees. SOF ¶¶ 29, 31–46. Sex offender parolees are subject to more than 30 statutory conditions plus individualized conditions imposed by parole agents and/or the Prisoner Review Board. *Id*. ¶¶ 31, 41; *see also* 730 ILCS 5/3-3-7. The conditions include GPS monitoring, sex offender treatment, and internet monitoring software. *Id*. ¶¶ 32, 36, 39. During face-to-face meetings with parole agents at the parolees' host site, the agent inspects all areas accessible to the parolee for contraband, checks electronic devices, checks the GPS band, and interviews the

25

parolee and the host. *Id.* ¶ 37. Parole agents also conduct home visits, employment checks, and monthly reviews of treatment progress. *Id.* ¶¶37–38. Moreover, parole agents have the explicit authority to prohibit one parolee from living with another if the agent determines it would imperil public safety—making the Ordinance's categorical prohibition both redundant and contrary to the individualized judgment that experienced parole professionals are trained to exercise. *Id.* ¶¶ 33–34, 41, 146.

Critically, GPS monitoring in Illinois is far more restrictive than Dr. Kennedy suggests. *See* SOF ¶ 46 ("Even if he is wearing an electronic ankle bracelet for monitoring purposes, authorities might know only *where* he is, but not *what* he is doing.") (emphasis in original). In fact, it does not merely identify a general location; it permits parole agents to verify whether the parolee has arrived at specific approved locations on schedule, enforces geographic restrictions (such as parks, schools, and the vicinity of victims' homes), triggers immediate alarms if a parolee fails to arrive at an approved area at the approved time or enters a restricted area, and accounts for all movement around the clock. *Id.* ¶ 39.[9]

Dr. Kennedy misunderstands the degree of supervision that sex offender parolees are under and ignores its effectiveness. In his expert report, he writes that parolees spend approximately 98 percent of their waking hours "supervision free." SOF ¶ 46. In his deposition, he elaborated: "Maybe [supervision of sex offenders is] intensive compared to other probationers, but not in the real soul meaning of the word." *Id.* When asked whether parole supervision mitigates the risk of

---

[9]    As Paul H. Robinson & Jeffrey Seaman have observed, "a properly implemented electronic prison system will make the chance of detection and punishment for new crimes so certain that most offenders will be compelled to choose self-preservation by not reoffending." Paul H. Robinson & Jeffrey Seaman, *Electronic Prison: A Just Path to Decarceration*, 58 U. ILL. CHI. L. REV. 307, 333 (2024).

recidivism, he answered: "I don't consider parole supervision to be particularly effective because it's really not intensive the way it's described." *Id.*

But the factual record in this case shows that supervision works. As Dixon explains, technical violations of parole conditions are regularly detected and enforced precisely because supervision is so close and continuous. SOF ¶ 43. Thus, a high rate of technical violations is evidence not of supervision's failure but of its effectiveness. Dr. Socia confirms that research shows individuals under parole supervision commit less crime and engage in less substance abuse than those not under supervision. *Id.* ¶ 44. And as documented above, both Kennedy and Cagnoni admitted they cannot identify a single instance of increased crime in Rockford attributable to sex offender parolees living together. *Id.* ¶¶68, 83–86. [10]

One must also question the foundation of Dr. Kennedy's criticism of Illinois supervision practices. His last hands-on involvement in the parole system was more than 50 years ago when he worked as a probation officer—not a parole officer—from 1968 to 1971 in Wayne County, Michigan. SOF ¶ 61. His knowledge of current Illinois parole practices was correspondingly thin. When asked what the conditions of supervision are for individuals convicted of sexual offenses under IDOC, he replied: "I can't recall each and every item." *Id.* ¶ 45. He likewise acknowledged that he is not knowledgeable about Illinois law and his book on supervision practices—published in 1973—reflected the world as he understood it "in the early 1970s based

---

[10]    Dr. Kennedy's analysis is also flawed because the highest-risk subset of people with sex offense convictions—those who are adjudged to be dangerous because they suffer from a mental disorder that makes it substantially probable that they will engage in acts of sexual violence —are addressed through Illinois' civil-commitment process rather than release onto ordinary MSR. SOF ¶¶ 47–52. Dr. Kennedy admits to being aware in general terms of Illinois' civil commitment program and that GHA residents "have been deemed not to meet the criteria for civil commitment." *Id.* ¶ 51. These two admissions severely undercut Kennedy's opinion that the Ordinance is justified because the residents of GHAs consist of the most dangerous offenders—*e.g.*, psychopaths, pedophiles, and mysopeds—individuals who, under Illinois law, would in fact, never be placed in a GHA in the first place.

on [his] experiences working" at that time. *Id*. In short, Dr. Kennedy's critique of modern Illinois sex offender supervision is the critique of a man who has not supervised a parolee in more than fifty years and who, by his own admission, does not know the conditions under which sex offender parolees in Illinois are supervised.

### 3. Dr. Kennedy Misrepresents the Evidence and Misunderstands the Scope of the Ordinance

Dr. Kennedy defends the Ordinance in part by referring to allegedly high rates of recidivism among persons with sex offense convictions on supervision, but his assertions do not withstand scrutiny. In particular, Dr. Kennedy relied on IDOC statistics stating that "55 percent of all sex offenders in Illinois recidivated in 2018." SOF ¶ 96. But this figure counted technical violations—meaning "anything that returns a person to custody"—as "recidivism." *Id.* ¶ 97. In his deposition, Dr. Kennedy admitted that he "lumped" together noncriminal returns to custody, such as an individual being taken back to IDOC due to loss of housing, and new crimes when stating that 55 percent of people with sex offense convictions recidivated. *Id*. ¶¶97–103.  He further admitted that he had no way to determine what portion of the "recidivism" figure he cited reflected new crimes rather than noncriminal events such as loss of housing. *Id*. ¶102. In short, Kennedy misleadingly cites statistics that reflect a high rate of returns to custody caused by inability to secure housing as if they provide evidence of criminal dangerousness.

Dr. Socia and Deputy Chief Dion Dixon explained the significance of that error. The higher recorded "recidivism" rate for people with sex offense convictions does not show that this group commits more new crimes, but instead largely reflects returns to custody for noncriminal technical violations, especially lack of approved housing. *Id*. ¶ 101. IDOC's published statistics count all returns to custody as recidivism, including "gate violators" who were eligible for MSR but lacked an approved host site and were therefore processed out and immediately readmitted to

custody. *Id.* ¶ 103. Deputy Chief Dixon explains that gate violations were common during the period from which Dr. Kennedy drew his recidivism statistics (2018-19), which was when Illinois' former one-per-address statute was still in effect. *Id.* ¶ 106. During that period, there were on average 1,200 to 1,400 people with sex offense convictions imprisoned in IDOC as technical parole violators solely because of their inability to secure housing. *Id.* ¶ 29. Thus, Kennedy's citation of IDOC recidivism statistics proves the opposite of what the City claims. Housing restrictions do not solve a crime problem. Instead, they simply drive returns to custody for lack of housing.

Dr. Kennedy's reliance on the so-called "dark figure" of sexual recidivism is no stronger. His report invokes unreported crime to suggest that official recidivism data understate the danger posed by people with sex offense convictions. *Id.* ¶ 87. But Dr. Socia explains that Kennedy's dark-figure argument is flawed because it conflates unreported sexual offending generally with unreported recidivist offending by people with prior convictions; it relies on studies of high-risk groups that cannot be generalized to all persons with past convictions; and it depends on assumptions that artificially inflate estimates of reoffense. *Id.* ¶ 89.

Dr. Kennedy admitted to these problems in his deposition. The victim surveys on which he relied concern criminal victimization generally, not recidivism by people who have already been caught and convicted; and Dr. Kennedy agreed he was extrapolating from figures about unreported offending generally to assume a high rate of unreported recidivism by people who have been released from custody onto MSR. *Id.* ¶ 88. That is not evidence that people residing in Rockford while on MSR are committing unreported crimes at high rates; it is speculation layered on top of generalized fear.

Dr. Kennedy's misunderstanding of the evidence is also illustrated by his treatment of

29

IDOC's "social networking" instruction. He relied on an IDOC "Instructions" form requiring certain supervisees to "refrain from any social networking" as support for his claim that Illinois prohibits parolees from associating with one another. SOF ¶ 35. As Deputy Chief Dixon explains, the instruction Dr. Kennedy cites concerns unauthorized social-media use (websites such as Facebook, Instagram, or TikTok) not association among parolees. *Id*. Illinois law does not impose a blanket prohibition on associations between people on MSR; it expressly allows "pro-social" associations. 730 ILCS 5/3-3-7(a)(13); SOF ¶ 33. In practice, parole agents permit many associations among parolees, including group therapy, jobs, community programs, support groups, and shared housing, while retaining discretion to prohibit particular associations—such as contact with co-offenders or gang associates—when individualized circumstances warrant it. *Id.* ¶ 34.

Dr. Kennedy also misunderstands the scope of the Ordinance. He treats Rockford's "Group Home for Adjustment" Ordinance as though it regulates only IDOC-funded halfway houses where "real estate entrepreneurs" are paid by IDOC to house sex offenders. *Id*. ¶ 17. He doesn't understand the types of housing to which the Ordinance applies. The amended definition of "Group Home for Adjustment" applies to any residence where two or more people under supervision live, including people on probation, pretrial release, parole, MSR, or work release, and it treats any multi-unit property as "one residence" for purposes of the GHA definition. *Id.* ¶ 2. IDOC-subsidized ICRP housing is only one category of housing the City has designated as a GHA. Rockford's definition also reaches private rental housing where tenants pay their own rent, and could even reach an owner-occupied single-family home if more than one resident is on supervision. *Id*. ¶¶ 2, 6, 14, 18. That mismatch matters because Dr. Kennedy's opinions are not tailored to the actual law at issue: they do not explain why ordinary private residential

30

cohabitation by two supervised adults—who may live in separate units of a multi-unit building, pay their own rent, and receive no services on site—creates any public-safety risk.

### 4. Dr. Kennedy's Political Responsiveness Argument Is Invalid

Throughout his expert report and deposition testimony, Dr. Kennedy argues that zoning laws are inherently political responses to community sentiment; that politicians who ignore constituent fears lose elections; and that this political dynamic is a legitimate and expected feature of democratic governance rather than a constitutional defect. SOF ¶¶ 65–66. He treats the political motivation for the Ordinance not as a problem to be explained away but as a virtue— evidence that the City was responsive to its residents. *Id.* ¶ 66.

Dr. Kennedy's argument has no valence in law, and it actually supports Plaintiffs' claims. His answer to the animus argument is this: yes, the community feared sex offenders, and yes, the City responded to that fear, and that is how democracy is supposed to work. In making the argument, Dr. Kennedy seeks to justify the Ordinance on grounds that the Supreme Court rejected in *Cleburne* and *Moreno*.

Dr. Kennedy is certainly not wrong that such laws are oftentimes an expression of popular fear and disgust. Perhaps the best explanation of this dynamic was made by Judge Trauger in *Doe v. Lee,* 752 F. Supp. 3d 884 (M.D. Tenn. 2024):

> The risk of legislation based solely on animus, rather than any genuine policy rationale, is both obvious and pronounced when the subject at issue is individuals who have been labeled as "sexual offenders" — whether or not that label holds up when subjected to closer inspection. The opprobrium that individuals considered sexual offenders face (as appropriate as that opprobrium, in many instances, may be) creates a political dynamic in which policymakers are, for the most part, only ever pulled in one direction — toward more invasive restrictions, more onerous requirements, and more public humiliation.

752 F. Supp. 3d at 899-900.

31

The problem is not that Dr. Kennedy recognizes the dynamic behind such laws; the problem is blessing them, based solely on popular will. Dr. Kennedy elevates popular sentiment beyond its proper lawful limits. Dr. Kennedy's error is to mistake political responsiveness for constitutional legitimacy. When the public sentiment to which officials respond is fear, disgust, or hostility toward an unpopular group, the fact that the Ordinance reflects that sentiment does not justify the law—it confirms the need for heightened rational basis review. [11]

Dr. Kennedy's final claim—that "perception is reality"—fares no better. He argues that even if GHAs do not actually increase crime, community fear itself can justify the Ordinance because fear may affect people's sense of safety and their property values. SOF ¶ 66. But perception is not reality. The constitutional problem with Rockford's Ordinance is precisely that it elevates fear and disgust over actual evidence. Fear cannot substitute for proof that GHAs actually cause the harms Rockford asserts. That is the same reasoning rejected in *Cleburne*. The government may not burden a politically unpopular group merely because neighbors are afraid of them or believe their presence will make the community less safe or desirable. 473 U.S. at 448.

### B. The City Has Not Brought Forth Reliable Evidence that GHAs Negatively Impact Housing Prices

Rockford's other justification for the ordinance is that GHAs reduce nearby residential property values. In support of this claim, the City submitted an expert report by Dr. Susan Yeh, dated December 9, 2025. *See* Ex. 24. In it, Dr. Yeh conducted a regression analysis using housing transactions in Rockford for the time period of 2020–2023 and found a statistically significant negative coefficient on her treatment variable, which she interprets as implying an average price

---

[11]  The pressures that political actors face to support bad and even irrational policy preferences of their constituents was captured neatly in the advice Soviet leader Nikita Khrushchev famously gave to Richard Nixon on his visit to Moscow in 1959: "If the people believe there is an imaginary river out there, you don't tell them there's no river out there," Khrushchev told Nixon. "You build an imaginary bridge over the imaginary river."

decrease of approximately 12.7–12.8 percent for homes located within 0.3 miles of a GHA following its arrival. SOF ¶ 107.

1. **Dr. Yeh's Expert Report Is Methodologically Unreliable and Does Not Support the City's Property Value Justification**

In response to Dr. Yeh's expert report, Dr. James J. Prescott, J.D., Ph.D., Professor of Law at the University of Michigan Law School and an expert in empirical legal studies and applied econometrics, reviewed Dr. Yeh's analysis and concluded that it "falls well short of accepted empirical practice" and "is not the type of analysis that would pass muster in a peer-reviewed academic journal, nor is it the type of evidence on which a careful researcher or policymaker would rely to draw causal conclusions." SOF ¶ 108. His critique rests on four independent and compounding grounds: first, that Dr. Yeh selected a single specification while omitting standard controls that her own peer-reviewed research employs, allowing pre-existing neighborhood differences and year-to-year market variation to masquerade as GHA-caused price declines; second, that she never subjected that single specification to the routine robustness checks that standard empirical practice requires, and that when Prescott performed those checks, her results did not survive; third, that her model fails to account for the staggered and overlapping nature of GHA openings in Rockford, rendering her pooled estimate an unreliable measure of any causal effect; and fourth, that even setting aside all three of those flaws and accepting her model entirely on its own terms, adding just one additional year of available data eliminates any statistically significant price effect.

a. **Dr. Yeh's Model Omits Standard Controls That Her Own Research Shows Are Essential**

Dr. Prescott's first critique is that Dr. Yeh selected a single specification while omitting standard controls—including neighborhood fixed effects and broader time controls—that her

33

own peer-reviewed research employs, allowing pre-existing neighborhood differences and year-to-year market variation to masquerade as price declines attributable to GHAs.

To understand this critique, it helps to understand what economists mean by "specification," "neighborhood fixed effects," and "time controls."

- "Specification" refers to the set of choices a researcher makes in constructing a model: which variables to include, how to measure them, what controls to add, what time period to use, and what functional form to employ. A specification is, in Dr. Prescott's words, "a particular way of implementing" a statistical model. SOF ¶ 109. Not including a particular variable (a "control") is a specification choice just as much as including one is. Two researchers using the same underlying data can (and in this case do) reach different conclusions simply by making different specification choices. As explained below, Dr. Yeh's omission of "neighborhood fixed effects" and "time controls" was not a neutral decision or an oversight; it was an affirmative specification choice that her own peer-reviewed work shows leads to unreliable results.

- "Neighborhood fixed effects" refers to the standard tool for addressing the risk that pre-existing neighborhood differences, rather than the GHA's arrival, are driving the observed price changes. SOF ¶ 110. This "risk" requires explanation. Imagine you are trying to determine whether the arrival of a GHA caused nearby home prices to fall. The ideal experiment would compare what happened to homes near GHAs to what would have happened to those same homes without a GHA, but you cannot rewind time. The practical substitute is to compare homes near GHAs to comparable homes in other parts of the city that are not near a GHA. The problem is that Rockford's neighborhoods are not identical. Some have better schools, lower crime, more stable price trajectories, and more owner-occupied homes than others—for reasons entirely unrelated to GHAs. If GHAs tend to be located in neighborhoods that were already experiencing weaker price growth (perhaps because those neighborhoods had more affordable rental housing available), then any price weakness you observe near GHAs may simply reflect that pre-existing disadvantage—not the GHA's arrival. This is what economists call "omitted variable bias." *Id*. ¶111. "Neighborhood fixed effects" are the standard tool for addressing this bias: rather than comparing homes in different neighborhoods, they force the analysis to compare homes *within the same neighborhood* over time, thereby neutralizing the influence of pre-existing differences. As Dr. Prescott explained, such controls "account for persistent differences across neighborhoods by effectively comparing homes within the same neighborhood over time, rather than across different neighborhoods." *Id*.

- "Time controls" address a related but distinct problem. Home prices do not move uniformly across all areas at all times. SOF ¶112. January 2021 looks very different from January 2024, because interest rates, inflation, and broader

34

macroeconomic conditions shift year to year, and they may affect different neighborhoods differently. If you compare a home sale near a GHA in July 2022 against a home sale far from a GHA in January 2021, you are not making an apples-to-apples comparison—you are mixing the potential effect of the GHA with the effect of eighteen months of broader market movements. *Id*. As Dr. Prescott testified, "[i]t would be unwise to assume that the timing doesn't matter," because comparing sales "a year or two apart" may introduce "lots of other things other than just the arrival of a GHA." *Id*. Broader time controls—including year fixed effects and treatment-specific time trends — address this by ensuring that observed price differences reflect the GHA's arrival, not the coincidental timing of market-wide movements.

Significantly, Dr. Yeh's analysis omits both "neighborhood fixed effects" and "time controls." SOF ¶ 117. When Dr. Prescott added neighborhood fixed effects, changing nothing else in Dr. Yeh's model, her reported 12.7 percent price decline evaporated: the estimated treatment effect "declines materially and is no longer statistically distinguishable from zero," with a coefficient of –0.059 and a standard error of 0.054, "well above conventional significance thresholds." SOF ¶ 119. When broader time controls were added, the estimate attenuated further. *Id.*

What makes this particularly damaging is that Dr. Yeh's own published peer-reviewed research demonstrates she understands these problems. In her 2015 academic paper, she warned that "[a] threat to validity may arise if unobserved area trends are correlated with the timing of the arrival," and explicitly included both neighborhood fixed effects and trend controls to address it. SOF ¶ 129. In her report for this case, she abandoned both. Her only explanation was that the Rockford data made such controls difficult to implement—effectively conceding the data's insufficiency, as discussed further below. SOF ¶ 130.

### b. Dr. Yeh Never Subjected Her Single Specification to Routine Robustness Checks

Standard empirical practice requires a researcher making a causal claim to demonstrate that the result is robust to reasonable alternative specifications. As Dr. Prescott explains, this means using "three or four columns where different assumptions are employed" to show that results are

35

"stable rather than dependent on a particular set of assumptions." SOF ¶ 115. The purpose is to determine whether "certain assumptions weren't driving the analysis." *Id*. Dr. Yeh did not do this. She "relies on a single specification — that is, a particular way of implementing her model — and defends it, rather than evaluating whether alternative, equally reasonable approaches point in the same direction." *Id*. ¶ 116.

This failure is independent of and compounding upon the omissions identified above. Even if one were to accept that Dr. Yeh's chosen specification was reasonable as a starting point, a researcher with genuine confidence in her result would test it. The fact that she did not is itself a methodological red flag. As Dr. Prescott observes, "results that are 'highly sensitive to modeling choices,' like those Dr. Yeh offers in her single regression in Exhibit 4, do not provide reliable evidence of a causal relationship." *Id*. ¶ 118.

Dr. Yeh's response — that relaxing her assumptions would reduce statistical precision (SOF ¶ 130) does not answer the concern. As Dr. Prescott states, "the relevant question is not whether a single specification of a model can produce a precise estimate, but whether the estimate provides a reliable and unbiased measure of the underlying effect." SOF ¶ 131. A precise but biased estimate is not evidence of a causal relationship—it is a number that reflects the analyst's choices more than the underlying reality.

### c. Dr. Yeh's Model Fails to Account for the Staggered and Overlapping Nature of GHA Openings in Rockford

Dr. Yeh's analysis treats GHA openings as if they were a single, uniform event occurring simultaneously across Rockford. They were not. Rockford's GHAs opened at different times between 2020 and 2023, and many homes in Rockford are located within 0.3 miles of more than one GHA—meaning they experienced multiple GHA "arrivals" at different times, not a single before-and-after event. SOF ¶¶ 126–127.

36

In plain English, the problem is this: Dr. Yeh's model works by comparing home prices near GHAs before and after a GHA opened against home prices in areas without GHAs. But in a setting where GHAs open at different times, the "control" homes—the ones supposedly unaffected by GHAs—may themselves have already experienced a GHA opening by the time they serve as controls. When that happens, you are comparing treated homes against other treated homes, which makes it impossible to isolate the GHA's effect. As Dr. Prescott explained in his deposition, "a lot of those cases that are being treated have already been treated—sometimes once, sometimes twice by being within a third of a mile from other GHAs." SOF ¶ 128. The result is that Dr. Yeh's pooled estimate "may not accurately reflect the magnitude—or even the direction—of any underlying effect associated with GHA openings." *Id*.

This is not a theoretical concern. It describes the actual structure of Rockford's data. "GHAs did not open simultaneously. Instead, they opened at different points between 2020 and 2023." SOF ¶ 126. "Some houses are exposed to two, three, or even four GHA openings over time." *Id*. Dr. Yeh's regression "collapses this structure into a single Treatment × Post indicator that does not distinguish between first exposure, subsequent exposure, duration of exposure, or treatment intensity." *Id*. ¶¶ 126–127. Under these conditions, the pooled two-way fixed effects estimator she employs "can produce a coefficient that differs materially from the true average treatment effect, including potentially in terms of the direction of the effect." *Id*.

### d. Dr. Yeh and Dr. Prescott Are Asking Different Questions — and Only One of Them Is the Right Question

The disagreement between these two experts is not merely a dispute about technical choices. It reflects a fundamental difference in what each analyst was trying to accomplish. Dr. Yeh's analysis asks: Given a particular set of maintained assumptions, can a statistically significant negative price effect be estimated from the available data? Her answer, under her chosen

specification applied to her chosen dataset, is yes. Dr. Prescott's analysis asks: Are those assumptions valid, and does the estimated effect reflect a true causal relationship independent of the analyst's modeling choices? His answer, after applying standard safeguards and adding available data, is no.

The distinction matters enormously. Dr. Yeh establishes only that under certain assumptions a negative price effect can be detected. She does not establish that those assumptions are correct, that the estimated effect would survive scrutiny from a neutral researcher, or that it reflects what actually happened to home prices in Rockford. As Dr. Prescott concludes, "her argument demonstrates only that a particular set of assumptions can generate a statistically precise estimate —not that the estimate is reliable, unbiased, or reflective of a true causal relationship." SOF ¶ 128.

This distinction is not a sophisticated methodological point. It is the difference between asking "can I find a number that supports my conclusion?" and asking "is my conclusion true?" The first question is what advocates do. The second is what scientists do.

Indeed, Dr. Yeh herself implicitly acknowledged the difference during her deposition. When asked which approach the court should rely upon—the more rigorous methodology of her 2015 peer-reviewed article or the simpler approach of Exhibit 4—she testified that her peer-reviewed approach was "very, very difficult to apply given the data that is available in the Rockford matter," and that Exhibit 4 was "not perfect" but "the best that I could do given what I had." SOF ¶ 130. She described her regression as "a starting point for what a researcher might want to consider." *Id.* A "starting point" is not a reliable basis for a causal conclusion. It is an invitation to do more work — which is precisely what Dr. Prescott did, ultimately refuting Dr. Yeh's conclusion.

38

**e. Even Accepting Dr. Yeh's Flawed Model, Adding One Year of Available Data Eliminates Any Statistically Significant Price Effect**

Dr. Prescott's most straightforward and devastating critique requires no technical expertise to evaluate. He simply added one additional year of available housing sales data to Dr. Yeh's own model—without changing a single assumption, a single control variable, or a single modeling choice — and her result disappeared. Dr. Yeh's analysis used housing transaction data from January 1, 2020 through December 31, 2023. SOF ¶¶ 106, 120.

When Dr. Prescott incorporated the 2024 data into Dr. Yeh's own specification—her model, her assumptions, her controls, unchanged—the estimated price effect "declines in magnitude by roughly three-quarters and loses statistical significance." SOF ¶ 121. Specifically, the estimated coefficient fell from $-0.137$ (statistically significant, $p \approx 0.03$) to $-0.035$ (statistically insignificant, $p \approx 0.60$). *Id*. The data are now "consistent with a wide range of possible effects, including no effect at all." *Id*. When standard neighborhood fixed effects are additionally applied to the extended dataset, the estimated coefficient becomes *positive* (0.047) consistent with, if anything, a slight *increase* in prices near GHAs. *Id*. ¶ 122. As Prescott summarizes: "An effect that diminishes and reverses sign under routine robustness exercises cannot be regarded as stable evidence of a causal relationship." *Id*.

This point is particularly forceful because Dr. Yeh cannot credibly deny that more data improves the analysis—she said so herself. When asked in deposition whether a larger sample size would give a more accurate reading of the effects of GHAs on housing prices, she answered: "I agree that having more data could be helpful in improving the precision of estimates." SOF ¶ 123. And in her own expert report, she acknowledged that the published studies on which she relies examined "tens of thousands to over a hundred thousand" property sales "over at least a decade's worth of data" in order to "arrive at statistically conclusive results." *Id*. Her Rockford

39

study covered only a handful of GHAs and four years of data. She described her dataset as "very small," and acknowledged that the resulting estimates are "noisier" and make it "harder to arrive at a precise estimate." *Id.* She knows her sample is thin. She knows more data is better. Prescott provided that data, applied her own model to it, and her conclusion evaporated.

Dr. Yeh's only response is that the 2024 data "were not available when she conducted her initial analysis." SOF ¶ 124. Dr. Prescott dispatches this in a single sentence: "the relevant question is not whether she did the best she could with limited data. It is whether her conclusions are correct, that is, whether they hold when more complete information is considered. They do not." SOF ¶ 131. Moreover, the 2024 data were available by the time she filed her rebuttal report in April 2026. She chose not to incorporate them. That choice speaks for itself.

### 2. Dr. Yeh's Analysis Cannot Distinguish Between the Effect of a GHA and the effect of a Single Sex Offender Parolee

Dr. Yeh's expert report is flawed for an additional reason. Rockford's Ordinance prohibits *more than one* sex offender parolee from living at the same address in R-1 and R-2 zones. A single sex offender parolee may live in any such property without restriction. The Ordinance's entire rationale therefore depends on a specific empirical proposition: that it is the *grouping* of parolees at a single address—not their mere presence in a neighborhood—that causes property values to decline. Unless grouping causes more harm than the presence of a single parolee living alone nearby, the Ordinance does not prevent the alleged harm. It simply restricts where a disfavored class of people may live.

Dr. Yeh's analysis cannot establish that grouping matters. Her treatment variable is simply the arrival of a GHA—she does not separately measure the presence, number, arrival, or departure of individual registrants living in the surrounding neighborhood. Her model therefore cannot distinguish between two equally plausible causal stories: that it is the GHA's multiple residents

40

living together that drives any price decline, or that it is simply the presence of any individual registrant in the neighborhood that does so. If the latter story is correct—and her analysis cannot rule it out—then the Ordinance does nothing to prevent the harm it claims to address, because it permits single registrants to live freely in R-1 and R-2 zones.

Making matters worse, Dr. Yeh never tested the assumption her model requires—that individual registrants were uniformly and stably present across treatment and control neighborhoods before the GHAs arrived. If the neighborhoods where GHAs opened were already accumulating more individual registrants over time, for reasons unrelated to the GHA itself, her model would mistakenly attribute those broader trends to the GHA's arrival. She did not investigate this. Her report contains no variable for individual registrant location, no control for registrant proximity, and no analysis of whether the marginal effect of a GHA differs from the effect of an additional single registrant moving nearby.

The Ordinance and Dr. Yeh's study share the same fatal flaw: both assume, without testing, that grouping matters. A rational basis requires evidence, not assumption. On the question that matters most for this particular ordinance, the record is silent.

### 3. Dr. Yeh's Transiency Assumption Is Unsupported, Internally Inconsistent, And Undermined By her Own Prior Research

Dr. Yeh anticipates the grouping problem and attempts to address it with a single argument: GHAs are different from individual registrant residences because they create a permanent, continuous, and institutionally stable presence of multiple sex offenders in a neighborhood, whereas individual registrants tend to be transient and their residences go undetected by the market. SOF ¶¶132–134. In her deposition, she explained the market mechanism behind this claim — namely, "the market might not always perceive a short-term address." *Id.* ¶ 134. She further confirmed that the Ordinance's justification rests on permanence rather than density: "I

think the ordinance does not speak to density, but it can affect the permanence of having a sex offender and whether or not the market is likely to respond." *Id.*

Dr. Yeh's transience-permanence explanation for why an individual sex offender parolee who lives in an R-1 or R-2 zone would not diminish property values in the same way as a GHA would fails for three independent reasons.

*First, the transiency assumption is unsupported by any evidence specific to Rockford.* Dr. Yeh claims GHAs "ensure that residents will be present on a continuing basis and for longer durations" because they have contracts with IDOC. SOF ¶ 132. But she acknowledged in her deposition that she never investigated whether all Rockford GHAs actually have IDOC contracts, and that she does not know how long residents actually stayed at any Rockford GHA. *Id.* ¶ 133. Her claim that sex offenders who reside in GHAs are there on a "continued long-term basis" rests only on residency *start* dates, which establish arrival, not duration or stability. *Id.*

*Second, the assumption is contradicted by what we know about this population.* Dr. Yeh assumes individual sex offender registrants move frequently while GHA residents stay put. But sex offender parolees on MSR face severe housing constraints—residency restrictions, registration requirements, stigma, and landlord reluctance—that make finding any compliant housing extraordinarily difficult. SOF ¶ 142. When they do find housing, it is logical that they tend to stay. The scarcity of available housing creates more residential stability for individual registrants, not less. Dr. Yeh did not investigate this. She simply assumed the opposite because it supported her conclusion.

*Third, Dr. Yeh's assertion that individual sex offender parolees who live alone in Rockford are transient does not make logical sense.* Parolees on MSR cannot move without IDOC approval. SOF ¶ 22. They are subject to GPS monitoring, host site restrictions, and supervision

42

conditions that make them among the most residentially stable members of the registrant population. *Id.* ¶¶ 39–41. By her own 2015 paper's finding, it is long-term, stable registrant presence that drives price effects—and MSR parolees, whether living alone or together, are exactly that stable population. Her transiency argument thus rests on an assumption that inverts reality: the population whose housing the Ordinance restricts is more stably housed than the general registrant population, not less. The distinction she draws between GHA residents and individual registrants evaporates on contact with the facts of this case.

In conclusion, Rockford cannot satisfy its burden under *Cleburne* and *Romer* with a property value study that dissolves when standard safeguards are applied and evaporates entirely when one additional year of readily available data is added. As Dr. Prescott states, Dr. Yeh's analysis is "not the type of analysis that would pass muster in a peer-reviewed academic journal, nor is it the type of evidence on which a careful researcher or policymaker would rely to draw causal conclusions." SOF ¶ 108. Under *Cleburne*'s requirement that the relationship between a classification and its asserted governmental interest not be "so attenuated as to render the distinction arbitrary or irrational," 473 U.S. at 446, a property value justification that rests on a single fragile specification, omits standard controls its own author uses in peer-reviewed work, and collapses when a neutral expert applies routine checks is not a legitimate governmental interest. It is a number manufactured to fill a gap in Rockford's defense.[12]

---

[12] In her report, Dr. Yeh also opines that "Economic literature supports the concerns underlying Rockford's ordinance that group homes with registered sex offenders can cause nearby residential house prices to decrease." SOF ¶ 105. Plaintiffs dispute this assertion and will respond to it, if necessary, in any response brief.

43

III. **Even If It Can Be Shown that Sex Offender Parolees Diminish Property Values, That Does Not Constitute a Valid State Interest to Justify the Ordinance**

A. **Rockford's Property-Value Justification Is Merely Community Animus with a Price Tag**

Rockford contends that the Ordinance is justified, at least in part, by evidence that residential properties located within a 0.3-mile radius of homes housing more than one sex offender parolee suffer diminished property values. Even accepting that contention as true for purposes of this argument, it cannot supply a legitimate governmental interest because the causal mechanism Rockford relies upon is community fear and stigma—precisely the kind of private animus that the Supreme Court held in *Cleburne* and *Moreno* the government may not credit.

Rockford does not and cannot contend that the presence of parolees in a residential property causes neighboring property values to decline through any channel independent of how neighbors and prospective buyers feel about the identity and status of those residents. The presence of parolees does not generate noise, produce environmental contamination, create physical hazards, or alter the land-use character of neighboring properties in any objective sense. The causal story Rockford tells is entirely subjective: neighboring residents fear and dislike having parolees nearby; prospective buyers share those feelings; and the resulting negative market reaction depresses property values. The thing that causes the property value decline, in other words, is the fear and stigma that attach to this disfavored group, not anything those individuals do.

This is precisely the causal structure that *Cleburne* held the government may not credit. In *Cleburne*, the city could have framed its neighbors' opposition to the group home in economic terms—concerns about neighborhood character, property values, and community feel—and those concerns would have been just as real and just as measurable as the concerns Rockford invokes

44

here. The Court nonetheless looked through those framing choices to the actual basis of the neighbors' reactions, which was fear and stigma directed at a disfavored group. 473 U.S. at 448. The Court held that negative reactions "unsubstantiated by factors which are properly cognizable" cannot justify differential treatment, regardless of how those reactions are described or quantified. *Id*. The same analysis applies here with equal force. Rockford's property-value data, even assuming its validity, does not independently justify the Ordinance. It merely quantifies the economic consequences of the community's fear and stigma toward people who have been convicted of sex offenses; it instantiates the public's hate and disgust in a price tag.

*Moreno* forecloses the same argument from a different angle. Under *Moreno*, the question is whether the governmental interest being served is legitimate (513 U.S. at 534), and an interest in protecting property values that decline because of community animus is not a legitimate interest, regardless of how faithfully the municipality measures or relies upon the data. The constitutional defect is not in the city council's subjective motivation; it is in the nature of the interest itself. A city that acts in perfect good faith on property-value data generated entirely by neighbors' bias is still acting on neighbors' bias. The Equal Protection Clause does not permit that result.

The Supreme Court's decision in *Palmore v. Sidoti*, 466 U.S. 429 (1984), reinforces this conclusion in terms that translate directly to the property-value context. In *Palmore*, the Court reversed a state court's decision to modify a child custody arrangement based on the social stigma that would attach to a biracial household—a stigma with real, measurable consequences for the child's wellbeing. The Court held that, while "[t]he Constitution cannot control such prejudices," "neither can it tolerate them." *Id*. at 433. Critically, the Court did not deny that the private prejudice had real-world effects; it held that those effects could not be the basis for governmental action precisely because they were rooted in private bias. Rockford's argument is

45

structurally identical: it asks this Court to accept community bias as a legitimate regulatory justification because that bias has real, measurable economic effects. *Palmore*, like *Cleburne* and *Moreno*, rejects that argument.

### B. Accepting Rockford's Argument Would Nullify the Animus Doctrine in the Land-Use Context

The broader implications of Rockford's position confirm that it cannot be correct. If a property-value rationale grounded in community fear and stigma were sufficient to justify differential treatment of a disfavored group of residents, the *Moreno-Cleburne* principle would be effectively nullified in any zoning or land-use case. The logic Rockford advances is not limited to sex offender parolees. Any municipality could discriminate against any disfavored group of residents—racial minorities, religious communities, recovering addicts, the mentally ill, individuals with criminal records—simply by pointing to the predictable market reaction of prejudiced neighbors. The property-value decline in such cases would always be real, measurable, and traceable to the neighbors' fear and discomfort rather than to anything the disfavored residents actually do. The more intense and widespread a community's prejudice against a group, the more readily it could be converted into a justification for discriminatory regulation.

### C. Rockford Cannot Rehabilitate Its Property-Value Justification by Characterizing It as a Response to Objective Market Data Rather Than Subjective Animus

Rockford may argue that the *Moreno-Cleburne* animus doctrine is inapplicable here because the City is not acting on subjective legislative hostility—it is responding to objective, empirical data showing measurable property-value declines. This argument does not survive scrutiny.

The animus inquiry does not turn on the subjective motivations of the legislators who enacted the challenged law. It turns on the nature of the interest being served. An interest in preventing

46

property-value declines that are caused by community fear and stigma is, at its constitutional core, an interest in accommodating community fear and stigma—regardless of how the City frames its evidentiary basis for the ordinance. The property-value data Rockford relies upon is not an independent variable; it is a measurement of the economic consequences of private animus. Relying on that measurement does not distance Rockford from the animus; it encodes the animus into the regulatory justification.

Simply put, Rockford's property-value rationale is not a legitimate governmental interest. It is the economic expression of community fear and animus towards parolees—precisely the kind of private prejudice that the Supreme Court has held, consistently and categorically, the government may not credit as a justification for differential treatment. *Moreno*, 413 U.S. at 534; *Cleburne*, 473 U.S. at 448; *Romer*, 517 U.S. at 632. Because that rationale is constitutionally void, it cannot supply the rational basis necessary to sustain the Ordinance.

## IV.   The Rationality of this Ordinance Is Undermined by Its Severe Countervailing Costs

The Supreme Court has made clear that in determining whether a challenged law is rationally justified, a court may properly take into account its countervailing costs.[13] Here, the record demonstrates that there are at least three foreseeable and severe countervailing costs that directly conflict with the public safety goals that Rockford professes the Ordinance serves: it dramatically reduces the availability of compliant housing for parolees, promoting homelessness and undermining public safety; it imposes a blanket parole condition by municipal fiat, displacing the individualized decisions made by parole professionals and serving to politicize the process of imposing parole conditions; and if upheld, it would almost certainly facilitate the

---

[13]   *See Plyler v. Doe*, 457 U.S. 202, 223-224 (1982) ("[I]n determining the rationality of [the challenged statute], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in [the statute] can hardly be considered rational unless it furthers some substantial goal of the State.")

47

passage of a cascade of harsh local residency restrictions that will eliminate or at least greatly diminish available housing options for sex offender parolees and others.

**A. The Ordinance Dramatically Reduces the Availability of Housing, thereby Promoting Homelessness and Undermining Public Safety**

By prohibiting more than one person on supervised release from residing together in R-1 and R-2 residential zones, the Ordinance dramatically reduces the supply of housing available to parolees with sex offense convictions who have no independent means to pay for private accommodations. This is not a prediction; it is recent history.

An Illinois statute known as the "one-per-address statute," codified at 730 ILCS 5/3-3-7(a)(7.6), prohibited individuals with sex offense convictions on MSR from living "at the same address" as another person who had been convicted of a sex offense—meaning the IDOC was required to reject any proposed host site where another registrant already resided. Dion Dixon, who served as Deputy Chief of the IDOC Parole Division from 2010 until his retirement in 2020 with statewide oversight of the Sex Offender Supervision Unit, explained the consequence of the statute:

> When the Illinois legislature previously enacted a law limiting more than one sex offender parolee from living at the same address, more than 1,000 people were returned to prison simply because they lost their housing. While the one-per-address statute was in effect, at any given time more than 1,200 individuals remained incarcerated past their release date because they could not find compliant housing. The situation improved only after a court entered an injunction prohibiting enforcement of that statute, which allowed the IDOC to begin meeting its release obligations.

SOF ¶¶ 27, 29.

In *Barnes v. Jeffreys*, 529 F. Supp. 3d 784 (N.D. Ill. 2021), the court struck down Illinois's one-per-address statute as unconstitutional under both the Eighth Amendment and the Equal Protection Clause. Critically for this case, the *Barnes* court also made affirmative factual findings about the benefits of shared housing—citing evidence that "permitting registrants to live together

48

reduces recidivism and improves supervision." *Barnes*, 529 F. Supp. 3d at 798. These findings are the opposite of what Rockford's ordinance assumes. *Barnes* found "no legitimate government interest, such as public safety or rehabilitation," that could justify the one-per-address restriction. *Id.* at 797. This Court recognized the relevance of *Barnes* in its motion to dismiss decision in this matter. *Do Not Pass Go, LLC v. City of Rockford*, 748 F. Supp. 3d 589, 600 (N.D. Ill. 2021). With discovery now complete, those findings stand unrebutted on this record.

Rockford's Ordinance is the municipal equivalent of Illinois' one-per-address statute, and the consequences of it would be the same: it would severely limit the viable housing for this population. It would make it impossible to operate the ICRP, which relies on the ability to place more than one person at the same location; and it would prevent people from being able to rent from the rare landlords who are willing to rent to people on parole. SOF ¶¶ 28–30, 141–144.

As explained by Deputy Chief Dixon, the "likely outcome" of the ordinance "would be a sharp rise in homelessness." SOF ¶ 141. And homelessness, as the research shows, is a major driver of recidivism. *See id.* ¶ 138 (IDOC Manager of Sex Offender Services Sarah Brown-Foiles' testimony that "homelessness is a risk factor for individuals for both sexual and criminal recidivism.") In his defense of the Ordinance, Dr. Kennedy admits that he did not consider the potential increase in homelessness that would result from it, although he acknowledges that homelessness is a risk factor for reoffending. *Id.* ¶ 139.

In short, the result of the Ordinance is not public safety; it is a reduction in housing, which is likely to increase recidivism rather than reduce it.

### B. The Ordinance Imposes a Blanket Parole Condition by Municipal Fiat, Displacing the Individualized Expertise of Parole Officers

Parole supervision in Illinois is an individualized, evidence-based system administered by trained correctional professionals for the purpose of balancing two oftentimes competing goals

49

— protecting public safety and promoting reintegration. The parties' experts agreed on this point. *See* SOF ¶ 147; *see also* 730 ILCS 5/3-3-7 (stating that conditions of mandatory supervised release "shall be such as the Prisoner Review Board deems necessary to assist the subject in leading a law-abiding life"). The balance is struck not by blanket legislative rules but by individual parole agents, on the basis of their professional judgment about particular people in particular circumstances.

Rockford's ordinance short-circuits this system. By prohibiting any two individuals on MSR from sharing a residence in R-1 or R-2 zones, the ordinance imposes a *mandatory* parole condition applicable to every parolee regardless of individual risk assessment, offense history, or the supervising agent's professional judgment. As Deputy Chief Dixon explained, "One problem with the Rockford ordinance is that it replaces individualized assessment with a blanket approach. Instead of allowing trained correctional professionals to decide whether two particular people can safely live together, the ordinance forbids it in all cases, even where parole concludes that the arrangement would promote compliance and reintegration." SOF ¶ 146.[14]

The implication of upholding this ordinance is that municipalities may override the professional judgment of state correctional agencies. Here, the IDOC has never concluded that limiting the number of parolees per address was necessary to ensure public safety. SOF ¶ 145. If the agency with the deepest expertise, the broadest data, and the most direct accountability for outcomes has never adopted this restriction, the claim that a municipality has a rational basis for imposing it—over the objection of that agency (*see* SOF ¶¶ 145–146)—requires more than generalized community concern. As Deputy Chief Dixon observed, "In passing this ordinance,

---

[14]   As Deputy Dixon points out, Illinois parole agents already have the authority Rockford purports to exercise. They can prohibit specific parolees from living with other specific parolees when their professional judgment indicates a safety risk. SOF ¶¶ 34, 41, 146

50

Rockford seems to be saying, we know better than the IDOC how to protect public safety." Ex. 19, Dixon Expert Rep., at 4.

Notably, Dr. Kennedy agreed that parole departments and not municipalities should be the ones who make decisions about how parolees should be supervised in the community. SOF ¶ 148. He also admits that allowing municipalities to enact their own restrictions on parolees "make[s] things more difficult" for parole officers and parolees. *Id*. ¶ 149.

Allowing municipal officials to impose restrictions on where parolees may live also politicizes the process of imposing parole conditions. It displaces individualized, evidence-based supervision decisions by categorical, fear-driven political judgments. When post-release restrictions are driven by electoral pressure rather than legitimate public safety rationales, the inevitable result is an ever-tightening spiral of restrictions, each one more politically popular and less evidence-based than the last. As Judge Trauger has explained, the ratchet only turns one way. *Lee*, 752 F. Supp. 3d at 900 (people convicted of sex offenses face "a political dynamic in which policymakers are, for the most part, only ever pulled in one direction—toward more invasive restrictions.")

### C. If Permitted, this Ordinance Will Almost Certainly Result in a Cascade of Increasingly Harsh Local Residency Restrictions

If Rockford is allowed to use its zoning authority to impose conditions on where individuals on MSR live, based on nothing more than generalized community concern and inapplicable studies from other markets, the consequence is that communities throughout Illinois and the country will do the same thing. This Court has previously recognized the risks presented by Rockford's ordinance. *Do Not Pass Go, LLC v. City of Rockford*, 748 F. Supp. 3d 589, 601-602 (N.D. Ill. 2021) ("if every municipality in Illinois were to pass an equivalent restriction to Rockford's, the One-Per-Address Statute struck down in *Barnes* and *Potkaj* would be

51

reconstituted as a patchwork quilt."). This is hardly idle speculation. It is well known that municipalities copy each other's laws. SOF ¶ 140 (describing the copy-cat effect among Wisconsin municipalities passing residency ordinances).

In conclusion, Rockford's Ordinance does not solve a public safety problem; it relocates one. It is at bottom a parochial measure—one that protects Rockford (if only by endorsing the community's popular will) by making everyone else worse off. It is entirely indifferent to the consequences for parole officials, for parolees, for the statewide parole system, for the communities elsewhere that absorb the people Rockford pushes away, and for the communities yet to come that will enact the next, harsher version of this ordinance. Rockford has simply drawn a circle around itself and called the inside safe, while exporting its problems to its neighbors, and offloading parolees into the streets, its obligations onto the state, and its constitutional obligations onto the courts.

## V. The Ordinance Fails Even Ordinary Rational Basis Review

Finally, the ordinance cannot survive even the most deferential standard of rational basis review. Government action cannot survive rational basis review if its justification is "flimsy or implausible." *United States R. Ret. Bd. v. Fritz*, 449 U.S. 166, 184 (1980). *Cleburne* establishes that the relationship between the classification and the asserted goal cannot be "so attenuated as to render the distinction arbitrary or irrational." 473 U.S. at 446. Here, there are three obvious ways this Ordinance fails ordinary rational basis review.

### A. The City Makes No Effort to Justify the Ordinance for any Category of Supervisees Other Than People Convicted of Sex Offenses

The Ordinance applies to *all* individuals on *any* form of criminal supervision as well as to

individuals who have never been convicted of a crime—*e.g.*, pretrial releasees. SOF ¶2[15] Yet the only evidence that the City of Rockford has offered to justify the Ordinance concerns individuals convicted of sex offenses. Even under the most deferential standard of review, a regulation must bear a rational relationship to a legitimate government interest. If, based on the City's arguments, the ostensible justification for the Ordinance is to protect the community from sexual offending, then applying the Ordinance to a probationer on a drug charge, or someone on work release for a property crime, or a pretrial detainee who got into a bar fight, has no logical connection to its purpose, making the Ordinance irrational as to these other populations.

**B**. **The City's Property-Value Theory Does Not Match the Ordinance It Enacted**

Rockford's Ordinance prohibits three parolees from living together in the same house but freely permits three parolees to live next door to one another on the same block. SOF ¶¶ 6–7 135. When asked whether that configuration—three registrants in geographic proximity but not in the same residence—could be expected to produce the same price effect as a GHA, Dr. Yeh acknowledged that it is possible, provided the registrants "lived together continuously at the same address, no interruptions, for a long enough time period." *Id*. Similarly, the City's 30(b)(6) witness testified that the risk to public safety is the same whether individuals on MSR live together in the same dwelling or on same block at separate addresses. SOF ¶60.

This is the textbook definition of under-inclusiveness, and under-inclusiveness of this magnitude is itself evidence that the Ordinance is not actually serving its stated purpose. The Supreme Court made this point explicitly in *Cleburne,* wondering "why [a home for mentally disabled individuals] warrants a density regulation that others need not observe" and finding the

---

[15]    Notably, the state has the prerogative to keep pretrial detainees in jail who are determined to present a "threat to the safety of any person or persons or the community." 725 ILCS 5/110-6.1(d)(1). Thus, the Ordinance applies to individuals who have not been convicted a crime and have been determined not to be a danger to the community.

selective treatment irrational. *Id*. at 448-50. The parallel here is clear-cut: Rockford burdens three parolees living together while exempting three parolees living next door to one another. The Ordinance draws a line that its own witnesses acknowledge does not correspond to the harm the Ordinance claims to address. It is not a rational means-end fit.[16]

### C. The Ordinance Merely Transfers the Alleged Problems to R-3 and R-4 Zones

Finally, Rockford's ordinance does not eliminate GHAs. It displaces them from R-1 and R-2 single-family residential zones to R-3 and R-4 multifamily zones or commercial zones, if a special use permit is granted. SOF ¶ 7. The implicit premise of this approach is that GHAs in R-3 and R-4 zones are less harmful—that the property-value effects that justify the ban in R-1 and R-2 zones either do not occur or are less severe in multifamily and higher-density residential zones. But Rockford has not supported this assumption with any evidence. In fact, asked pointblank whether her testimony is that a group home in an R-3 or R-4 area would not result in a reduction in the price of nearby multifamily homes, Dr. Yeh retreated entirely from defending the proposition:

> No, that is not my testimony. I don't have — I have not looked at R-3 and R-4 homes, and I believe the literature largely does not look at that.

SOF ¶ 137.

---

[16] Relatedly, the Ordinance applies only to persons under criminal supervision. It does not apply to individuals with past sex offense convictions who have completed their supervision. Three individuals on the registry who have completed parole and choose to live together in a private rental in an R-1 or R-2 zone are entirely unregulated. When asked whether such an arrangement would produce the same price effects as a supervised GHA, Dr. Yeh testified:

> Under the assumption that there were no other sex offenders in that area before these three appeared, yes, I think the literature suggests that [there would be a price reduction].

SOF ¶ 136.

54

**CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully ask this Court to grant their motion for summary judgment against Defendant City of Rockford on their claim that the City's "Group Home for Adjustment" Ordinance violates the Fourteenth Amendment.

Respectfully submitted,

/s/ Mark G. Weinberg
/s/ Adele D. Nicholas
*Counsel for Plaintiffs*

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com