**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

DO NOT PASS GO, LLC; *et al*.,

    Plaintiffs,

        v.

CITY OF ROCKFORD,

    Defendant.

3:24-cv-50074

Hon. Rebecca R. Pallmeyer

Magistrate Judge Margaret J. Schneider

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (AMENDED)**

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

FACTUAL BACKGROUND  ...........................................................................................1

I. The Ordinance ...........................................................................................................1

II. The Housing Regulated By the Ordinance...............................................................2

III. The Plaintiffs............................................................................................................3

IV. Mandatory Supervised Release ................................................................................4

ARGUMENT....................................................................................................................5

I.   Plaintiffs' Equal Protection Claim Is Subject to Heightened Rational Basis
Review Under the Animus Inquiry ............................................................................5

   A.  Rational Basis Review Is Not a Rubber Stamp ...................................................5

   B.  When a Law Targets a Despised Group, Courts Apply a More Searching
      Form of Rational Basis Review ...........................................................................6

   C. The Animus Inquiry Involves Two Distinct Questions .......................................8

      1.  The Facts of this Case Suggest the Presence of Animus ..............................8

         a. The Text of the Ordinance .......................................................................8

         b. The Context of the Law's Passage  ..........................................................9

         c. The Legislative History ...........................................................................11

         d. The Law's Real-World Effects.................................................................12

      2. The City Must Identify a Legitimate Justification That Actually Supports
         the Validity of the Ordinance Based on Evidence  ........................................12

II. The Ordinance Does Not Meaningfully Advance the City's Alleged Interests...........14

   A.  The City Has No Evidence that the Ordinance Promotes Public Safety . ...........14

   B.  The City Has Not Brought Forth Reliable Evidence that GHAs Negatively
      Impact Housing Prices .......................................................................................17

1.   Dr. Yeh's Expert Report Is Methodologically Unreliable and Does Not Support the City's Property Value Justification ............................................18

    a.   Dr. Yeh's Model Omits Standard Controls That Her Own Research Shows Are Essential..................................................................................18

    b.   Dr. Yeh Never Subjected Her Single Specification to Routine Robustness Checks....................................................................................19

    c.   Dr. Yeh's Model Fails to Account for the Staggered and Overlapping Nature of GHA Openings in Rockford .....................................................20

    d.   Dr. Yeh and Dr. Prescott Are Asking Different Questions .......................20

    e.   Even Accepting Dr. Yeh's Flawed Model, Adding One Year of Available Data Eliminates Any Statistically Significant Price Effect .....21

2.   Dr. Yeh's Analysis Cannot Distinguish Between the Effect of a GHA and the Effect of a Single Sex Offender Parolee ..........................................22

3.   Dr. Yeh's Transiency Assumption Is Unsupported, Internally Inconsistent, And Undermined By her Own Prior Research ..............................................23

III. Even If It Can Be Shown that Sex Offender Parolees Diminish Property Values, That Does Not Constitute a Valid State Interest to Justify the Ordinance .................24

IV. The Rationality of this Ordinance Is Undermined by Its Severe Countervailing Costs..........................................................................................26

V.   The Ordinance Fails Even Ordinary Rational Basis Review....................................29

CONCLUSION....................................................................................................30

**INTRODUCTION**

Plaintiffs challenge a zoning ordinance enacted by the City of Rockford ("the City") that restricts where people under any form of criminal supervision may reside. The Ordinance defines any address where more than one person on supervision lives as a "Group Home for Adjustment" ("GHA"), even when the property is used solely as a residence. The Ordinance prohibits GHAs anywhere in R-1 and R-2 residential districts and permits them elsewhere only with a special-use permit. Statement of Material Facts ("SOF") ¶¶ 2, 5, 7.

Plaintiffs acknowledge that the government may impose reasonable regulations on people with past sex offense convictions, and courts have upheld many such restrictions as valid efforts to protect the public. *See, e.g., Smith v. Doe*, 538 U.S. 84 (2003) (registration); *Vasquez v. Foxx*, 895 F.3d 515 (7th Cir. 2018) (residency restrictions around daycares). This case is about the limits of that authority. *See Ortiz v. Breslin*, No. 20-7846, 2022 U.S. LEXIS 767, at *8 (Feb. 22, 2022) (statement of Sotomayor, J.) ("the Constitution protects all people, and it prohibits the deprivation of liberty based solely on speculation and fear."). As the Supreme Court cautioned in *Packingham v. North Carolina*, although "a legislature may pass valid laws to protect children … the assertion of a valid governmental interest cannot, in every context, be insulated from all constitutional protections." 582 U.S. 98, 106 (2017) (cleaned up).

In the analysis below, Plaintiffs show that Rockford's Ordinance fails constitutional scrutiny because it singles out a feared and disfavored group for special housing restrictions that do not apply to anyone else; the City has no real-world evidence that GHAs increase crime or reduce property values; and the long-term consequences of upholding the Ordinance are severe.

**FACTUAL BACKGROUND**

**I.  The Ordinance**

Until December 2023, Rockford's Zoning Ordinance defined a "Group Home for Adjustment" as "[a] residence for those under court supervision while on probation, pre-release, or work release wherein supervision, rehabilitation and counseling are provided to mainstream residents back into society enabling them to live independently." SOF ¶1.

On December 4, 2023, the Rockford City Council made two changes to the definition of what constitutes a GHA: it removed the requirement that "supervision, rehabilitation and counseling" be provided on site, and expanded the definition to cover individuals on parole or Mandatory Supervised Release ("MSR"). *Id*. ¶2. The amended definition provides that "any property with multi-unit dwellings shall be considered one residence." *Id.* As a result of these amendments, any address where more than one individual on any kind of criminal supervision resides in Rockford is defined as a GHA, even if the address is used solely as a residence and even if individuals on supervision are tenants in separate units of a multi-unit building. *Id*. ¶7.

The zoning code categorically prohibits establishment of a GHA in any area of Rockford zoned for single-family or two-family dwellings (R-1 and R-2 zones) and allows establishment of a GHA in multi-family residential zones (R-3 and R-4) or commercial zones (C-1, C-2, C-3, or C-4) only with an approved special-use permit. *Id*. ¶5.

In all of its residential districts, Rockford allows up to three unrelated individuals to occupy a residential dwelling unit as a "family" (which the code defines as individuals who "maintain a common household and single housekeeping unit.") *Id*. ¶¶3-4. However, under the amended Ordinance, individuals on supervision are excluded from residing together as a "family." *Id*. ¶5.

## II. The Housing Regulated By the Ordinance

The amended Ordinance affects two types of housing. First, it applies to housing used by the Illinois Department of Corrections' Intensive Community Reintegration Program ("ICRP"),

which provides housing to individuals on MSR who cannot otherwise secure their own housing. *Id*. ¶ 8. ICRP locations are residential only. Services for participants—including therapy, case management, vocational training, and employment services—are provided off-site, and IDOC does not have employees living at ICRP locations. *Id*. ¶13. As of June 2025, the ICRP housed approximately 380 people at approximately 40 addresses statewide. *Id*. ¶10. IDOC pays contractors on a per-person *per diem* basis to house ICRP participants. *Id*. ¶9.

The Ordinance also applies to housing that is not subsidized by the IDOC. *Id*. ¶12. For example, a residence where three individuals on MSR live as roommates and pay rent to a private landlord is also defined as a GHA. *Id*. ¶¶2, 12, 14..

In a letter to IDOC, dated Nov. 8, 2023, the City of Rockford identified thirteen addresses where more than one individual on MSR was residing in violation of the amended Ordinance. *Id*. ¶15. These properties housed a total of 58 individuals who were subject to the Ordinance. *Id.*

### III.  The Plaintiffs

Plaintiff Next Step Recovery Homes ("NSRH") is an ICRP vendor that operates in several cities in Illinois, including Rockford. As of July 2025, NSRH had six properties in Rockford that could house a total of 24 people. *Id*. ¶11.

Plaintiff Do Not Pass Go ("DNPG") is not an IDOC-contracted vendor; it is a private landlord that offers private-pay housing to individuals on MSR. *Id*. ¶12. DNPG currently has two properties in Rockford where it rents to people under supervision. *Id*.

Plaintiff Jason Ridley Jr. resided as a private-pay tenant on the first floor of 326 N. Avon, a property operated by DNPG, while he was on MSR. *Id*. ¶14. He paid rent and resided with two roommates. *Id*. Three other persons resided in a separate unit on the building's second floor. *Id*. The City identified both units at 326 N. Avon as being out of compliance with the Ordinance. *Id*.

3

### IV.    Mandatory Supervised Release

Following a felony prison sentence, most individuals released from the IDOC are sentenced to a period of community supervision called MSR. *See* 730 ILCS 5/3-3-7(a). Illinois law vests responsibility for setting the conditions of MSR with the Prisoner Review Board. *Id*. The PRB is statutorily obligated to impose certain conditions. For example, all persons on MSR must "obtain permission … before leaving the State"; and "consent to a search of his or her person, property, or residence." 730 ILCS 5/3-3-7(a)(1)-(21). Additional conditions, such as undergoing sex offender therapy, GPS monitoring, and consenting to searches of all internet-capable devices, are mandatory for persons with sex offense convictions. 730 ILCS 5/3-3-7(a)(7.5)-(7.13).

The PRB has discretion to impose other conditions of MSR based on an "individualized assessment" of the parolee's risk and needs. 730 ILCS 5/3-3-7(b), (b-1); 730 ILCS 5/3-14-2. These discretionary conditions may include, among other things, that the parolee "work or pursue a course of study"; "undergo medical or psychiatric treatment"; or "refrain from entering into a designated geographic area." 730 ILCS 5/3-3-7(b), (b-1). Parole agents also have the authority to impose additional rules "that are consistent with furthering ... the goals and objectives of [the individual's MSR] or to protect the public." 730 ILCS 5/3-3-7(a)(15).

Individuals with sex offense convictions must have a Department-approved place to live (called a "host site") before they can be released from IDOC custody onto MSR. SOF ¶¶17-18. For people with sex offense convictions, the locations of host sites are substantially restricted by state law, which prohibits individuals classified as child sex offenders from residing within 500 feet of schools, playgrounds, daycares, or facilities serving children. *Id*. ¶16. If a person with a sex offense conviction cannot secure an approved host site, the person remains in prison rather than being released to MSR in the community. *Id.* ¶18.

The Code of Corrections provides that a person on MSR may not "knowingly associate with other persons on parole or mandatory supervised release without prior written permission of his or her parole agent," while expressly permitting associations involving "pro-social activit[ies] in which there is no evidence of criminal intent." SOF ¶25. In practice, parole agents approve many pro-social associations among parolees, including group therapy, jobs, support groups, and shared housing. *Id.* At the same time, parole agents retain discretion to prohibit particular associations that pose an individualized risk, including contact with former co-offenders, gang associates, or other individuals whose involvement would increase re-offense risk. *Id*.

**ARGUMENT**

**I. Plaintiffs' Equal Protection Claim Is Subject to Heightened Rational Basis Review Under the Animus Inquiry**

**A. Rational Basis Review Is Not a Rubber Stamp**

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Its essential directive is that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Because the Ordinance does not target a suspect class and no fundamental right is directly implicated, this Court reviews the Ordinance under the rational basis standard. *See id.* at 440.

Under ordinary rational basis review, a law is presumed constitutional and will be sustained if the classification it draws is rationally related to a legitimate governmental interest. *Id*. The standard is deliberately permissive. Legislatures need not produce empirical evidence that a harm exists or is likely to occur; they may act prophylactically, anticipating problems before they materialize. *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993).

5

That said, rational basis review is not a rubber stamp. "[T]he standard of rationality ... must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe,* 509 U.S. 312, 321 (1993). A court must still identify a genuine connection between the classification and an asserted objective; it "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne,* 473 U.S. at 446. The rational basis inquiry thus guards against government action that is arbitrary or lacks any legitimate purpose, and the "[s]earch for the link between classification and objective gives substance to the Equal Protection Clause." *Romer v. Evans,* 517 U.S. 620, 632 (1996).

### B. When a Law Targets a Despised Group, Courts Apply a More Searching Form of Rational Basis Review

The Supreme Court has long recognized that rational basis review requires special vigilance when the government singles out a politically unpopular group. This heightened attention— sometimes called "rational basis with bite"—reflects a straightforward insight: because legislatures are always free to hypothesize a legitimate rationale after the fact, there is a risk that naked hostility will masquerade as public policy when the targeted group commands little popular sympathy. *See Cleburne,* 473 U.S. at 448; *Romer,* 517 U.S. at 634–35.

The canonical statement of this principle appears in *Cleburne*, where the Supreme Court struck down a special-use permit requirement applied to a group home for people with intellectual disabilities. The Court held that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases" for treating one group differently from others. *Cleburne,* 473 U.S. at 448. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Id.* (citation omitted). And because one of the vital purposes of the Constitution is to protect the rights of minorities that are politically powerless to protect themselves, the Court refused to

6

accept legislative hostility as a legitimate governmental interest. *Cleburne,* 473 U.S. at 440.

The same principle animated *U.S. Dep't of Agriculture v. Moreno,* 413 U.S. 528 (1973), where the Supreme Court invalidated a provision of the Food Stamp Act that excluded households containing unrelated persons. The Court explained that "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* at 534.

In *Romer v. Evans,* 517 U.S. 620 (1996), the Supreme Court applied the same mode of analysis. Colorado's Amendment 2, which precluded anti-discrimination laws based on sexual orientation, was framed in neutral terms, and the state defended it as simply "put[ting] gays and lesbians in the same position as all other persons." 517 U.S. at 626. Looking to the breadth of the enactment, the implausibility of the proffered justifications, and the evident relationship between the law and animus toward the targeted class, the Court struck it down, holding that a law that "inflicts on [a disfavored class] immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it" cannot be upheld. *Id*. at 635.

The Sixth Circuit applied this logic in a case strikingly similar to the one at hand. In *Bannum, Inc. v. City of Louisville,* 958 F.2d 1354 (6th Cir. 1992), the Sixth Circuit struck down a zoning ordinance that restricted the placement of halfway houses in residential areas, finding that where a city offers no evidence linking its ordinance to any actual harm, and where the class targeted is one the community simply does not want nearby, the ordinance fails even deferential rational basis review. *Id.* at 1363.

The reason courts apply heightened scrutiny in these circumstances is not to abandon deference to legislative judgments, but to ensure that deference does not become a license for

prejudice. When the government targets a group that inspires fear or revulsion—and when the asserted justifications are thin, borrowed from unrelated contexts, or disconnected from the challenged enactment—courts have both the authority and obligation to look more carefully.[1]

### C. The Animus Inquiry Involves Two Distinct Questions

The animus inquiry involves two distinct questions: (i) how does a plaintiff demonstrate that the animus inquiry should even be invoked—*i.e.*, that the challenged law warrants more searching review?; and (ii) once invoked, how does a plaintiff prove that animus, rather than a legitimate governmental interest, drove the enactment? Plaintiffs address each question in turn.

#### 1. The Facts of this Case Suggest the Presence of Animus

There is not a precise test to determine whether animus is behind the passage of a particular law. However, as Professor Carpenter has observed, in *Moreno*, *Cleburne*, *Romer*, and *U.S. v. Windsor,* 570 U.S. 744 (2013)*,* the Court has identified several broad categories of evidence that are relevant to the animus inquiry: (1) the statutory text; (2) the political and legal context of the law's passage; (3) the legislative history; (4) the law's real-world effects; and (5) the failure of alternative, non-animus-based explanations to account for the law. *See* Carpenter, *supra*, at 599. As shown below, these factors point unmistakably toward animus in this case.

##### a. The Text of the Ordinance

---

[1] The anti-animus principle has deep roots in the constitutional order, tracing back to the Framers' concerns about faction and class legislation. *See* William Araiza, *Animus: A Short Introduction to Bias in the Law* (2017) at 11–28 (tracing the animus doctrine back to James Madison's warnings in Federalist No. 10 about factions "who are united and actuated by some common impulse of passion, or of interest, adverse to the rights of other citizens."). Professor Cass Sunstein has observed that one of the most enduring themes running through the Constitution is the prohibition of what he calls "naked preferences"—*i.e.*, governmental decisions that distribute burdens or benefits "solely on the ground that those favored have exercised the raw political power to obtain what they want." Cass R. Sunstein, *Naked Preferences and the Constitution*, 84 Colum. L. Rev. 1689, 1689 (1984). Legal scholar Dale Carpenter has observed that the anti-animus principle exists precisely because "the political process is not self-correcting" when majoritarian hostility is directed toward a politically powerless group. Dale Carpenter, *The Dead End of Animus Doctrine*, 74 Ala. L. Rev. 585, 589-90 (2023).

As Carpenter explains, animus analysis begins with the text: whether the law singles out a particular group for adverse treatment. Carpenter at 599–600; *see also Romer*, 517 U.S. at 627 (finding it significant that Amendment 2 placed gay and lesbian people "in a solitary class").

The Ordinance does exactly that. It defines a "group home for adjustment" as any address where more than one person on probation, pre-release, parole, MSR, or work release resides. SOF ¶ 2. No other group of residents is subject to comparable restrictions. A landlord may rent to groups of college students, recovering alcoholics, or formerly homeless people without a special-use permit. *Id*. ¶¶4-5. Only people under supervision trigger the Ordinance.

The December 2023 amendment made that targeting explicit. The prior ordinance applied to residences where "supervision, rehabilitation and counseling" were provided, giving it at least some connection to regulating how the property was used. SOF ¶¶1-2. The amended Ordinance deleted that requirement, making clear that Rockford's concern is not the provision of services, but the mere presence of people on supervision in residential neighborhoods. By stripping away the use-based element and replacing it with a status-based restriction, the amendment provides strong textual evidence that the Ordinance is exclusionary, not regulatory.

### b. The Context of the Law's Passage

The Supreme Court's animus cases also look to the legal and political context in which a law was enacted, which can reveal whether the challenged law singles out an unpopular group for "discrimination[] of an unusual character." *Windsor*, 570 U.S. at 770. In *Windsor*, the Court found it significant that the Defense of Marriage Act departed from the federal government's usual practice of accepting state-law marriage definitions. *Id*. And in *Cleburne*, the Court found it significant that the City required a special-use permit for a home for people with intellectual disabilities, even though comparable group-living arrangements were allowed without one. 473

9

U.S. at 448–50.

Here, as in *Windsor* and *Cleburne*, the context suggests the Ordinance is rooted in animus. Most significantly, the Ordinance is unlike ordinary zoning laws because it regulates the identity of occupants, not the use of land. Zoning ordinances typically regulate physical land-use characteristics—density, setbacks, building height, and activities on the parcel. *See Village of Euclid v. Ambler Realty Co*., 272 U.S. 365 (1926). They do not regulate who may live in a dwelling. *See* Arden H. Rathkopf, *The Law of Zoning and Planning* § 60.16 (4th ed.) ("zoning deals with land use, not the owner, operator, or occupant of the land"). A rule barring more than one person under supervision from living at the same address is not a land-use regulation in any meaningful sense. It is a status-based restriction that restricts the housing options of a defined group of persons based entirely on who they are rather than how they plan to use the residence.

The parallel to *Cleburne* is straightforward. There, the City required a special-use permit for a group home for people with intellectual disabilities, while allowing other group-living arrangements—such as apartments, fraternities, hospitals, and nursing homes—without the same requirement. 473 U.S. at 447–48. The Supreme Court looked past the zoning label and found that the differential treatment could not be explained by the property's physical use, but only by the identity of the people who would live there: "The short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded." *Id*. at 450.

Rockford's Ordinance draws the same kind of distinction. Its ban on more than one person on supervised release living at the same address in R-1 and R-2 districts is not tied to density, occupancy, building safety, traffic, noise, or any other land-use characteristic. Any other household of three unrelated people is permitted. But two people on supervision may not live

10

together even if all that they do on the property is sleep, eat, and watch television. The operative distinction is not the use of the property, but the legal status of the people who live there.[2]

### c. The Legislative History

The Supreme Court has also found statements by policymakers relevant to determine whether an animus inquiry is appropriate. In *Moreno*, for example, the Court noted that the legislative history contained an explicit statement by a congressman that the amendment's purpose was to prevent "hippies" from obtaining food stamps. *Moreno*, 413 U.S. at 534. In *Cleburne*, the City admitted that its demand for a special-use permit for the group home was driven by neighbors' objections to the presence of people with intellectual disabilities. *Cleburne*, 473 U.S. at 448–50.

Here too, the legislative history plainly sets forth the City's true purpose—namely, to limit individuals convicted of sex offenses from living in residential areas in Rockford. The Rockford Planning and Zoning Committee Report from the Nov. 21, 2023, meeting states that the Ordinance was enacted in response to a perceived "influx of sex offender parolees" being released from IDOC to Rockford. SOF ¶34. The City's Legal Director testified before the Committee that the amendment was prompted by "a number of individuals [having] been released to the Rockford area from prison on [MSR]," many of whom "are from outside of Winnebago County." *Id*. ¶35. The City's 30(b)(6) witness candidly admitted that the City took into account "public perception" of people who are on parole and people who have been convicted of sex offenses when enacting the Ordinance. *Id*. ¶38. This is relevant because sex offenders (parolees or otherwise) are by common acknowledgment among the most socially

---

[2]    When asked whether Rockford imposes any other restrictions on property use in residential areas based on the "identity or status of the person who occupies the property as opposed to what they do on that property," Rockford's 30(b)(6) witness could identify none; he simply repeated that the City "regulate[s] property by use." *Id*. ¶7. That circular label does not change the operative fact that the Ordinance is triggered by who lives in the home, not by any activity occurring there.

11

stigmatized groups in American life. *Does 1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016) (explaining that people convicted of sex offenses are "widely feared and disdained.")

### d. The Law's Real-World Effects

As Professor Carpenter explains, courts also look to a law's "harsh real-world effects, from which an animus-based purpose can be inferred," as one of the key indicators of unconstitutional motivation. Carpenter, *supra*, at 599. As the Court observed in *Romer*, when a law imposes "immediate, continuing, and real injuries" on a disfavored group that are not simply "incidental" to the law's operation, the inference of animus is difficult to resist. *Romer*, 517 U.S. at 635.

Here, the real-world effects of the Rockford ordinance confirm its animus-based character. At the time the complaint was filed, at least 58 persons on MSR residing in Rockford faced immediate displacement from their homes and return to prison if they did not find alternative housing. SOF ¶¶15, 18. Likewise, the corporate plaintiffs face the impossible choice of evicting their tenants or paying a fine of $50 to $500 per violation per day. *Id*. ¶6.

In conclusion, the record leaves no doubt about the City's true motivation for the Ordinance. City officials amended the zoning code in explicit response to what they described as a perceived "influx of sex offender parolees." No evidence of harm was presented. No study was cited. No public safety justification was offered. The Ordinance was enacted because individuals convicted of sex offenses are politically unpopular. The targeting of this particular group compels the more searching rational basis inquiry.

### 2. The City Must Identify a Legitimate Justification That Actually Supports the Validity of the Ordinance Based on Evidence

Once animus is shown to be a motivating force behind a law, the government may still defend it by identifying a legitimate purpose that independently explains the challenged classification. But the inquiry is no longer ordinary rational basis review, which allows courts to

hypothesize conceivable justifications after the fact. The question now is whether the law can "reasonably be understood to result from a justification independent of unconstitutional grounds." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018).

That inquiry requires a real connection between the asserted purpose and the line the law draws. A law cannot be justified by a mere invocation of a government interest; there must be a "plausible connection" between the asserted interest and the measure under review. Sunstein, *supra*, 1696–97. The inquiry is not whether a plausible rationale can be articulated in the abstract, but whether the evidence supports a genuine connection between the Ordinance and a legitimate purpose. *See Cleburne*, 473 U.S. at 448–50.

*Cleburne* illustrates how the Supreme Court applies this analysis. The city there invoked familiar zoning concerns—neighborhood opposition, traffic, density, and proximity to other facilities. But the Court did not simply accept those interests at face value. It asked why a home for people with intellectual disabilities required a special-use permit when comparable group-living arrangements did not. 473 U.S. at 448–50. Because the asserted concerns applied with equal or greater force to uses the city allowed without a permit, the Court concluded that the permit requirement appeared to rest not on a legitimate land-use distinction, but on "irrational prejudice" against the people who would live in the group home. *Id.* at 450. As Professor Carpenter explains, the city's stated justifications were "strained efforts to allow it to act on prejudice and fears" of the disfavored group, none of which explained why the group home should be treated differently from other multi-unit dwellings. Carpenter, *supra*, at 593–94.

The same analysis applies here. Rockford cannot rely on abstract invocations of safety or property values; it must identify evidence that actually explains the line the Ordinance draws. *Cleburne* refused to accept generalized zoning concerns where they did not distinguish the

13

disfavored group home from comparable permitted uses. The same mismatch exists here.

## II. The Ordinance Does Not Meaningfully Advance the City's Alleged Interests

Rockford's rationales for the Ordinance have been a moving target. At the time of passage, the sole justification was to address a perceived "influx of sex offender parolees." SOF ¶34. Then, at the motion-to-dismiss stage, Defendant offered three justifications for the Ordinance—preserving the character of single-and-two-family housing zones; protecting property values; and protecting the housing stock available to families, (ECF 27, Rockford's MTD, at 9-10), at the same time asserting that under rational basis review Rockford's justifications need not be factually accurate (*id*. at 9) and need only be conceivable (*id*. at 11). Then, in the City's answers to interrogatories and testimony of its 30(b)(6) witness, Defendant identified ten justifications for the Ordinance, including protecting and promoting the public health, safety, and general welfare; promoting the peace, quiet, and enjoyment of residential areas; and maintaining orderly and compatible development patterns that promote an appropriate mix of land uses. SOF ¶36.

In the end, Rockford seemed to settle on two principal justifications for the Ordinance: (1) the preservation of public safety; and (2) the prevention of diminishment of property values. SOF ¶37. As shown below, neither holds up to scrutiny.

### A. The City Has No Evidence the Ordinance Promotes Public Safety

The City justifies the Ordinance on public-safety grounds, arguing that people with sex offense convictions on supervision present a heightened risk of recidivism and that Rockford may reduce that risk by prohibiting them from living together in residential areas. But the record does not support that rationale.

The City's own witnesses admitted that Rockford has no evidence that shared housing has harmed public safety. The City's criminology expert, Dr. Daniel Kennedy, agreed that he had

14

"not identified any evidence that there has been an actual increase in crime in Rockford as a result of persons on parole residing together." SOF ¶43. He also admitted that he has not evaluated whether the Ordinance is effective at promoting public safety. SOF ¶44. Rockford's 30(b)(6) witness, Todd Cagnoni, made the same concession: the City did not undertake any Rockford-specific analysis of whether people on supervision living in Rockford caused an increase in crime, could not identify any public-safety harm caused by GHAs during the two-year (and on-going) stay of enforcement of the Ordinance, and had no "specific thing" it could point to showing that negative effects identified in outside studies had actually occurred in Rockford. *Id*. ¶¶54-56.

Nor has the City shown that cohabitation itself is criminogenic. Cagnoni testified that the City's theory is not that risk increases "by virtue of individuals residing in the same dwelling," but only that more people on supervision create more aggregate risk. SOF ¶¶39, 42. That concession exposes the Ordinance's poor fit. Rockford does not limit the total number of people on supervision who may live on the same block or in the same neighborhood. It only prohibits two people under supervision from sharing a home in R-1 and R-2 districts, while allowing those same people to live next door to one another in separate homes. *Id*. If the asserted risk is concentration, the Ordinance does not address it. If the asserted risk is cohabitation, the City has no evidence that cohabitation increases crime.

Dr. Kennedy's co-offending theory does not fill that gap. He opines that allowing people on supervision to live together may increase the risk of co-offending, but he admitted that he is unaware of any actual co-offending by people residing together in Rockford GHAs, had not analyzed whether such co-offending had occurred, and had not been told that such co-offending had occurred. SOF ¶ 45. Plaintiffs' expert, Dr. Kelly Socia, explains that the existing research

15

does not support the conclusion that parolees living together have an increased risk of reoffending; to the contrary, studies addressing shared parolee housing suggest that it may reduce recidivism risk. *Id.* ¶48. The Department of Corrections' witnesses agreed that allowing parolees to reside together did not lead to an increase in crime. *Id*. ¶¶51, 52, 98.

Rockford's public-safety rationale also ignores the intensive supervision already imposed on this population. People with sex offense convictions on MSR are subject to more than 30 conditions, including GPS monitoring, sex-offender treatment, internet monitoring, searches, curfews, and individualized restrictions imposed by parole agents and the PRB. SOF ¶¶ 24-30. Parole agents have authority to prohibit associations between people on supervision, including shared housing, based on individualized public-safety judgments. *Id*. ¶¶25, 30. The Ordinance replaces that individualized supervision judgment with a categorical municipal ban. Dr. Kennedy discounts the adequacy of IDOC's supervision, but the record shows the opposite. *Id.* ¶¶24-30. Moreover, Dr. Kennedy's critique is without meaningful foundation. He admitted that he could not recall the conditions of supervision for people with sex offense convictions and that his own experience with supervision practices dates to the late 1960s and early 1970s. *Id.* ¶¶31-32.[3]

Dr. Kennedy's final public-safety rationale is not empirical at all. He argues that zoning laws are inherently political responses to community sentiment; that politicians who ignore constituent fears lose elections; and that this political dynamic is a legitimate feature of democratic governance. *Id*. ¶40. He further contends that "perception is reality": even if GHAs

---

[3]    Dr. Kennedy's recidivism evidence is also deeply flawed. He relied on IDOC statistics stating that "55 percent of all sex offenders in Illinois recidivated in 2018," but that figure counted technical violations, anything that returns a person to custody, as "recidivism." SOF ¶60. Dr. Socia and Deputy Chief Dixon explain that the higher recorded "recidivism" rate for people with sex offense convictions largely reflects returns to custody for lack of approved housing due to the One-Per-Address Statute that was then in effect. *Id*. ¶¶62-63. In other words, the data Kennedy treats as evidence of dangerousness actually reflects the housing instability that restrictions like Rockford's Ordinance make worse.

do not actually increase crime, community fear itself can justify the Ordinance because fear may affect residents' sense of safety and property values. *Id*. ¶41.

That argument confirms, rather than defeats, Plaintiffs' equal protection claim. The problem is not that elected officials listened to constituents. The problem is that the sentiment to which they responded was fear and hostility toward a politically unpopular group, unsupported by evidence that the targeted housing caused actual harm. Judge Trauger explained how this dynamic works in a similar context:

> The risk of legislation based solely on animus, rather than any genuine policy rationale, is both obvious and pronounced when the subject at issue is individuals who have been labeled as "sexual offenders" — whether or not that label holds up when subjected to closer inspection. The opprobrium that individuals considered sexual offenders face (as appropriate as that opprobrium, in many instances, may be) creates a political dynamic in which policymakers are, for the most part, only ever pulled in one direction — toward more invasive restrictions, more onerous requirements, and more public humiliation.

*Doe v. Lee*, 752 F. Supp. 3d 884, 899-900 (M.D. Tenn. 2024).

*Cleburne* forbids the City from converting that dynamic into a zoning restriction. Community fear may be politically powerful, but it is not itself evidence that GHAs increase crime. Nor may "perception" substitute for proof that the regulated housing actually causes the harms Rockford asserts. A municipality cannot impose special burdens on a disfavored group merely because neighbors believe their presence will make the community less desirable. *See Cleburne*, 473 U.S. at 448. Dr. Kennedy's "perception is reality" argument is therefore not a legitimate justification for the Ordinance; it is the constitutional defect in the Ordinance stated aloud.

### B. The City Has Not Brought Forth Reliable Evidence that GHAs Negatively Impact Housing Prices

Rockford's other justification for the ordinance is that GHAs reduce nearby residential property values. In support, the City submitted an expert report by Dr. Susan Yeh, who conducted

17

a regression analysis using housing transactions in Rockford for the time period of 2020–2023 and found a statistically significant negative coefficient on her treatment variable, which she interprets as implying an average price decrease of approximately 12.7–12.8 percent for homes located within 0.3 miles of a GHA following its arrival. SOF ¶¶64, 66-67.

1.  **Dr. Yeh's Expert Report Is Methodologically Unreliable and Does Not Support the City's Property Value Justification**

In response to Dr. Yeh's expert report, Dr. James J. Prescott, J.D., Ph.D., Professor of Law at the University of Michigan Law School and an expert in applied econometrics, reviewed her analysis and concluded that it "falls well short of accepted empirical practice" and "is not the type of analysis that would pass muster in a peer-reviewed academic journal." SOF ¶68. His critique has four parts: (1) Dr. Yeh used a single specification while omitting standard controls that her own peer-reviewed research employs; (2) she did not conduct routine robustness checks, and her results do not withstand those checks; (3) her model failed to account for the staggered timing of GHA openings; and (4) even accepting her model on its own terms, adding one additional year of available data eliminates any statistically significant price effect.

a.  **Dr. Yeh's Model Omits Standard Controls That Her Own Research Shows Are Essential**

Dr. Prescott's first critique is that Dr. Yeh selected a single specification while omitting standard controls—including neighborhood fixed effects and broader time controls—that her own peer-reviewed research employs, allowing pre-existing neighborhood differences and year-to-year market variation to masquerade as price declines attributable to GHAs. *Id*. ¶¶69-72, 88.[4]

---

[4]    To understand this critique, it helps to understand what economists mean by "specification," "neighborhood fixed effects," and "time controls." "Specification" refers to the choices a researcher makes in constructing a statistical model, including which variables, controls, time period, and functional form to use. "Neighborhood fixed effects" are a standard way to control for pre-existing differences among neighborhoods that may affect home prices independent of the variable being tested. Those differences may include school quality, crime rates, owner-occupancy, or other characteristics unrelated to GHAs. By

When Dr. Prescott added neighborhood fixed effects, changing nothing else in Dr. Yeh's model, her reported 12.7 percent price decline evaporated: the estimated treatment effect "declines materially and is no longer statistically distinguishable from zero." *Id*. ¶79. When broader time controls were added, the estimate attenuated further. *Id.*

What makes this particularly damaging is that Dr. Yeh's own published peer-reviewed research demonstrates she understands these problems. In her 2015 academic paper, she warned that "[a] threat to validity may arise if unobserved area trends are correlated with the timing of the arrival," and explicitly included both neighborhood fixed effects and time controls to address it. *Id.* ¶88. In her report for this case, she abandoned both. Her only explanation was that the limited dataset for Rockford home sales made such controls difficult to implement. *Id*. ¶89.

### b. Dr. Yeh Never Subjected Her Specification to Routine Robustness Checks

Standard empirical practice requires a researcher making a causal claim to test whether the result is robust to reasonable alternative specifications. As Dr. Prescott explains, that means estimating "three or four columns where different assumptions are employed" to determine whether the result is "stable rather than dependent on a particular set of assumptions." SOF ¶75. Dr. Yeh did not do so. Instead, she "relies on a single specification" rather than testing whether alternative, equally reasonable approaches produce the same result. *Id*. ¶76.

That failure is significant. Even assuming Dr. Yeh's chosen specification was a reasonable starting point, she cannot make a reliable causal claim without testing whether her result survives

---

comparing homes within the same neighborhood over time—rather than comparing homes across different neighborhoods—neighborhood fixed effects reduce the risk that ordinary neighborhood differences will be mistaken for a GHA-related price effect. "Time controls" address the separate risk that changes in home prices reflect broader market conditions rather than the variable being tested. Home prices may change over time because of interest rates, inflation, or other market forces, so comparing sales from different years may confuse those background changes with the effect of a GHA's arrival. Time controls reduce that risk by helping distinguish any GHA-related price effect from coincidental market movements. SOF ¶¶69-72.

19

ordinary changes in modeling assumptions. As Dr. Prescott observes, results that are "highly sensitive to modeling choices," like Dr. Yeh's single regression, "do not provide reliable evidence of a causal relationship." *Id.* ¶78.

Dr. Yeh's response—that relaxing her assumptions would reduce statistical precision (*id.* ¶89) does not answer the concern. The question is not whether one model can generate a precise number, but whether that number is reliable and unbiased. *Id.* ¶90. A precise but biased estimate is not evidence of causation; it is a reflection of the analyst's assumptions.

### c. Dr. Yeh's Model Fails to Account for the Staggered and Overlapping Nature of GHA Openings in Rockford

Dr. Prescott also shows that Dr. Yeh's model fails to account for the staggered and overlapping timing of GHA openings. Rockford's GHAs did not open all at once; they opened at different times between 2020 and 2023, and some homes were exposed to two, three, or even four GHA openings over time. SOF ¶85-86. Yet Dr. Yeh's regression collapses that structure into a single before-and-after treatment variable, without distinguishing between first exposure, later exposure, duration of exposure, or treatment intensity. *Id.*

That matters because homes treated as "controls" may already have been affected by earlier GHA openings. *Id.* ¶¶85-86. Comparing treated homes to other treated homes makes it impossible to isolate the effect of a GHA's arrival. As Dr. Prescott explained, under these conditions Dr. Yeh's pooled estimate "may not accurately reflect the magnitude—or even the direction—of any underlying effect associated with GHA openings." *Id.*

### d. Dr. Yeh and Dr. Prescott Are Asking Different Questions

The disagreement between the parties' experts is not technical; it reflects a fundamental difference in what each analyst was trying to accomplish. Dr. Yeh asks whether a negative price effect can be generated using her chosen assumptions and dataset. Dr. Prescott asks whether

those assumptions are valid and whether the result reflects a reliable causal relationship. After applying standard safeguards, his answer is no.

This distinction is not a sophisticated methodological point. It is the difference between asking "can I find a number that supports my conclusion?" and asking "is my conclusion true?" The first question is what advocates do. The second is what scientists do. Dr. Yeh shows only that a negative effect appears under one set of assumptions. She does not show that those assumptions are correct, that the result survives scrutiny, or that it reflects what actually happened in Rockford. As Dr. Prescott explains, "her argument demonstrates only that a particular set of assumptions can generate a statistically precise estimate, not that the estimate is reliable, unbiased, or reflective of a true causal relationship." SOF ¶87.

When asked whether the court should rely on the more rigorous methodology of her 2015 peer-reviewed article or the simpler approach used in her report, she testified that her analysis for this case was "not perfect" but was "a starting point for what a researcher might want to consider." *Id*. ¶88-89. A starting point is not a reliable basis for a causal conclusion. It is an invitation to do more work—which is precisely what Dr. Prescott did.

### e. Even Accepting Dr. Yeh's Flawed Model, Adding One Year of Available Data Eliminates Any Statistically Significant Price Effect

Dr. Prescott's most straightforward and devastating critique requires no technical expertise to evaluate. He simply added one additional year of available housing-sales data to Dr. Yeh's own model—without changing any assumption, control variable, or modeling choice—and her result disappeared. Dr. Yeh's analysis used housing transaction data from January 1, 2020 through December 31, 2023. SOF ¶80. When Dr. Prescott added the 2024 data to her specification, the estimated effect "declines in magnitude by roughly three-quarters and loses statistical significance," falling from –0.137 (statistically significant, $p \approx 0.03$) to –0.035 (statistically

21

insignificant, p ≈ 0.60). *Id*. ¶81. The data are therefore "consistent with a wide range of possible effects, including no effect at all." *Id*. And when standard neighborhood fixed effects are applied to the extended dataset (*i.e.*, sales data from 2020 through 2024), the coefficient becomes positive, consistent, if anything, with a slight price increase near GHAs. *Id*. ¶82. As Dr. Prescott explains, "[a]n effect that diminishes and reverses sign under routine robustness exercises cannot be regarded as stable evidence of a causal relationship." *Id*.

Dr. Yeh's only response is that the 2024 data were unavailable when she conducted her initial analysis. *Id*. ¶83. But, as Dr. Prescott explains, the question is not whether she did the best she could with limited data; it is whether her conclusions hold when more complete information is considered. They do not. *Id.* ¶84. Moreover, the 2024 data were available by the time she filed her rebuttal report in April 2026. She chose not to incorporate them. That choice speaks for itself.

### 2. Dr. Yeh's Analysis Cannot Distinguish between the Effect of a GHA and the Effect of a Single Sex Offender Parolee

Dr. Yeh's analysis is flawed for another reason: it cannot show that grouping matters. Rockford's Ordinance prohibits more than one sex-offender parolee from living at the same address in R-1 and R-2 zones, but allows individual sex-offender parolees to live in those same areas without restriction. The Ordinance's validity therefore depends on the premise that multiple parolees at one address cause property-value harm distinct from the mere presence of a registrant or registrants in the neighborhood.

Dr. Yeh did not test that premise. Her treatment variable is the arrival of a GHA; she does not separately measure the presence, number, arrival, or departure of individual registrants in the surrounding area. Her model therefore cannot distinguish between two possibilities—that any price effect is caused by multiple residents living together or that it is caused by the presence of

any registrant nearby. If the latter is true, the Ordinance does not address the alleged harm because it permits single registrants to live in R-1 and R-2 zones.

Nor did Dr. Yeh test whether individual registrants were uniformly and stably present across treatment and control areas before GHAs opened. If GHA neighborhoods were already seeing more registrants over time for reasons unrelated to the GHA, her model could wrongly attribute that trend to the GHA's arrival. Her report includes no variable for individual registrant location, no control for registrant proximity, and no analysis of whether a GHA has a different effect than an additional single registrant nearby.

The Ordinance and Dr. Yeh's study share the same flaw: both assume, without testing, that grouping matters. On the question that matters most for this ordinance, the record is silent.

### 3. Dr. Yeh's Transience Assumption Is Unsupported, Internally Inconsistent, and Undermined by her Own Prior Research

Dr. Yeh tries to solve the grouping problem by arguing that GHAs are different from housing where a single registrant resides because GHAs create a "continued and permanent" presence of registrants, while individual registrant residences are more transient and thus less likely to be perceived by the market. SOF ¶91. In her words, "the market might not always perceive a short-term address," and the Ordinance's justification rests not on density, but on "the permanence of having a sex offender." *Id*.

That explanation fails for three reasons. First, it is unsupported by Rockford-specific evidence. Dr. Yeh claims GHAs ensure a continuing, long-term presence because they have IDOC contracts, but she admitted that she did not investigate whether all Rockford GHAs actually have IDOC contracts and does not know how long residents stayed at any Rockford GHA. *Id*. ¶92.

Second, her transience assumption is contradicted by the realities facing this population.

23

People convicted of sex offenses face severe housing barriers, including residency restrictions, stigma, and landlord reluctance. *Id*. ¶¶16, 18, 95. When housing is scarce and difficult to obtain, the logical inference is that people who secure housing tend to stay. Dr. Yeh did not investigate whether individual registrants in Rockford were actually transient; she assumed it.

Third, Dr. Yeh's transience assumption makes even less sense for people on MSR. Parolees cannot move without IDOC approval and must live at an approved host site. *Id*. ¶17-18. They are therefore likely to be among the more residentially stable members of the registrant population. Because Dr. Yeh's own theory depends on stable, market-perceived presence, her distinction between GHA residents and individual registrants does not hold. The population restricted by the Ordinance is not meaningfully more transient when living alone than when living together.

In conclusion, Rockford cannot justify the Ordinance with a property-value study that collapses when standard safeguards are applied and one additional year of data is considered. As Dr. Prescott explains, Dr. Yeh's analysis is not "the type of evidence on which a careful researcher or policymaker would rely to draw causal conclusions." SOF ¶ 68. Under *Cleburne*, the connection between a classification and its asserted purpose cannot be "so attenuated as to render the distinction arbitrary or irrational." 473 U.S. at 446. Dr. Yeh's study leaves that connection far too attenuated to sustain the Ordinance.[5]

III. **Even If It Can Be Shown that Sex Offender Parolees Diminish Property Values, That Does Not Constitute a Valid State Interest to Justify the Ordinance**

Even if Rockford had reliable evidence that GHAs reduce nearby property values, that would not supply a legitimate governmental interest for the Ordinance. The causal mechanism Rockford

---

[5] In her report, Dr. Yeh also opines that "Economic literature supports the concerns underlying Rockford's ordinance." SOF ¶65. Plaintiffs dispute this assertion and will respond to it, if necessary, in any response brief.

24

invokes is not noise, traffic, density, environmental harm, or any objective change in land use. It is community fear and stigma—that is, neighbors and prospective buyers dislike living near people with sex offense convictions, and that may affect market prices.[6] But under controlling Supreme Court precedent, the government may not give legal effect to private bias merely because that bias has measurable consequences.

*Cleburne* is directly on point. There, the City could have characterized neighborhood opposition to a group home for people with intellectual disabilities in terms of property values, neighborhood character, or community stability. The Court looked through those labels to the actual basis of the objection: fear and negative attitudes toward a disfavored group. 473 U.S. at 448. It held that such reactions, "unsubstantiated by factors which are properly cognizable," cannot justify differential treatment. *Id*. Rockford's property-value theory does the same thing in economic form. It does not identify an independent harm caused by the residents' conduct or the property's use; it merely quantifies the market consequences of community fear.

*Moreno* forecloses the same argument from another angle. The question is whether the asserted governmental interest is legitimate. 413 U.S. at 534. Protecting property values that are depressed by community animus is not a legitimate interest, even if the City relies on that market reaction in good faith. A city that acts on property-value diminishment that resulted from neighbors' bias is still giving legal effect to that bias.

*Palmore v. Sidoti*, 466 U.S. 429 (1984), reinforces the point. There, the Court rejected a decision to award custody to one parent based on the social stigma attached to the other parent's

---

[6] Notably, both of Rockford's expert witnesses identified community bias as the basis for any price decline. *See* Ex. 31, Susan Yeh, *Revealing the rapist next door: Property impacts of a sex offender registry*, Int'l Rev. L. & Econ. (2015) at 43 ("While housing prices suggest fear of or distaste for high-risk sex offenders, sex crime risk is not higher after an offender moves in."); SOF ¶41 (Dr. Kennedy's testimony that "I know people … prefer not to… liv[e] next to people who have broken the law and particularly with regard to sex offenders, and that is why you have this challenge to property values.")

interracial marriage, even though it recognized that stigma could have real consequences for the child. The Court explained that the Constitution "cannot control such prejudices," but "neither can it tolerate them." *Id*. at 433. Rockford's argument is structurally identical: it asks the Court to accept community bias as a legitimate regulatory basis because that bias may have measurable economic effects. *Palmore*, *Cleburne*, and *Moreno* reject that argument.

Accepting Rockford's position would largely nullify the animus doctrine in land-use cases. Any municipality could restrict housing for a disfavored group—people with criminal records, people with mental illness, recovering addicts—by pointing to the predictable market reaction of fearful or prejudiced neighbors. The more intense the prejudice, the stronger the claimed property-value justification would become. The Equal Protection Clause does not permit private bias to become more constitutionally acceptable simply because it can be measured in dollars.

Rockford therefore cannot rehabilitate its property-value rationale by pointing to market data. The data are not an independent justification; they are, at most, a measurement of the economic consequences of private stigma; they are, in short, the economic instantiation of hate. Because the asserted property-value interest depends on accommodating that stigma, it cannot supply the rational basis necessary to sustain the Ordinance. *See Moreno*, 413 U.S. at 534; *Cleburne*, 473 U.S. at 448; *Palmore*, 466 U.S. at 433.

## IV.   The Rationality of this Ordinance Is Undermined by Its Severe Countervailing Costs

In determining whether a law is rationally justified, courts may properly take into account the law's countervailing costs.[7] Here, the Ordinance imposes at least three severe and foreseeable costs that undermine Rockford's claimed public-safety rationales: it reduces compliant housing,

---

[7]    *See Plyler v. Doe*, 457 U.S. 202, 223-224 (1982) ("[I]n determining the rationality of [the challenged statute], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in [the statute] can hardly be considered rational unless it furthers some substantial goal of the State.")

increasing homelessness and instability; it replaces individualized parole decisions with a blanket municipal rule; and, if upheld, it would invite copycat residency restrictions that could sharply reduce housing options for people on supervision.

First, the housing consequences are not speculative; they are recent history. Illinois' "one-per-address" statute prohibited individuals with sex offense convictions on MSR from living at the same address as one another, requiring IDOC to reject host sites where another registrant already lived. 730 ILCS 5/3-3-7(a)(7.6). Dion Dixon, who oversaw IDOC's Sex Offender Supervision Unit until his retirement, explained that when the statute went into effect, "more than 1,000 people were returned to prison simply because they lost their housing," and while it remained in effect, "more than 1,200 individuals remained incarcerated past their release date because they could not find compliant housing." SOF ¶19. In *Barnes v. Jeffreys*, 529 F. Supp. 3d 784 (N.D. Ill. 2021), the court struck down that statute, finding "no legitimate government interest, such as public safety or rehabilitation," that justified the rule, and crediting evidence that "permitting registrants to live together reduces recidivism and improves supervision." *Id*. at 797–98.

Rockford's Ordinance recreates the same problem locally. It would severely limit viable housing by making it impossible to operate the ICRP in Rockford and by preventing parolees from renting from landlords willing to rent to people on supervision. SOF ¶¶22, 97. Dixon explained that the "likely outcome" would be "a sharp rise in homelessness" (*id*. ¶97), which directly undermines public safety. IDOC's Manager of Sex Offender Services, Sarah Brown-Foiles, testified that homelessness is a risk factor for both sexual and general criminal recidivism. *Id.* ¶95. Dr. Kennedy agreed, yet he did not consider this potential effect of the Ordinance. *Id*.

Second, the Ordinance replaces the individualized judgment of parole professionals with a blanket municipal rule. Illinois parole supervision is designed to balance public safety and

27

reintegration through individualized decisions by trained correctional officials. *Id*. ¶100. Parole agents already have authority to decide whether particular people may safely associate or live together, and to prohibit shared housing where individualized facts warrant it. *Id*. ¶¶25, 30, 99. Rockford's Ordinance overrides that system with a categorical rule forbidding shared housing in R-1 and R-2 zones regardless of the supervising agent's judgment. As Dixon explained, the Ordinance "replaces individualized assessment with a blanket approach" and forbids arrangements that parole officials may conclude would promote compliance and reintegration. *Id*. ¶99. This is especially irrational because IDOC itself, the agency with the deepest expertise, broadest data, and direct accountability for supervision outcomes, has never concluded that a one-per-address restriction is necessary for public safety. *Id.* ¶98. Allowing municipal officials to impose restrictions on where parolees may live also politicizes the process of imposing parole conditions. Post-release restrictions would be driven by electoral pressures rather than legitimate public safety rationales, with the inevitable result being an ever-tightening spiral of restrictions, each one more politically popular and less evidence-based than the last. As Judge Trauger has explained, the ratchet only turns one way. *Lee*, 752 F. Supp. 3d at 900 (people convicted of sex offenses face "a political dynamic in which policymakers are, for the most part, only ever pulled in one direction—toward more invasive restrictions.")

Finally, if Rockford's Ordinance is upheld, other municipalities can be expected to copy it. This is hardly idle speculation. It is well known that municipalities copy each other's laws. SOF ¶96 (describing the copy-cat effect among Wisconsin cities passing residency ordinances). This Court has already recognized the risk: if every Illinois municipality adopted Rockford's rule, the one-per-address statute struck down in *Barnes* would be "reconstituted as a patchwork quilt." *Do Not Pass Go, LLC v. City of Rockford*, 748 F. Supp. 3d 589, 601–02 (N.D. Ill. 2021).

28

## V. The Ordinance Fails Even Ordinary Rational Basis Review

Finally, the ordinance cannot survive even the most deferential standard of rational basis review. Government action cannot survive rational basis review if its justification is "flimsy or implausible." *United States R. Ret. Bd. v. Fritz*, 449 U.S. 166, 184 (1980). *Cleburne* establishes that the relationship between the classification and the asserted goal cannot be "so attenuated as to render the distinction arbitrary or irrational." 473 U.S. at 446. Here, there are three obvious ways this Ordinance fails ordinary rational basis review.

First, the Ordinance sweeps far beyond the City's asserted rationale. It applies to anyone on probation, pre-trial release, parole, MSR, or work release, regardless of offense. SOF ¶ 2.[8] But the City has only offered evidence concerning people with sex offense convictions. If the ostensible justification for the Ordinance is to protect the community from sexual offending, then applying the Ordinance to a probationer on a drug charge, someone on work release for a property crime, or a pretrial detainee who got into a bar fight, has no logical connection to its purpose, making the Ordinance irrational as to these other populations.

Second, the Ordinance does not match the harms the City invokes. It prohibits three parolees from living together in one house, but allows the same three parolees to live next door to one another on the same block. *Id.* ¶42. Dr. Yeh acknowledged that this configuration could produce the same property-value effect as a GHA, and the City's 30(b)(6) witness testified that the public-safety risk is the same whether individuals on MSR live together or on the same block at separate addresses. *Id.* ¶¶39, 42, 93. Like the selective permit requirement in *Cleburne*, the line

---

[8] Notably, the state has the prerogative to keep pretrial detainees in jail who are determined to present a "threat to the safety of [persons] or the community." 725 ILCS 5/110-6.1(d)(1). Thus, the Ordinance applies to individuals who have not been convicted a crime and have been determined not to be a threat.

the City has drawn does not correspond to the asserted harm. 473 U.S. at 448–50.[9]

Third, the Ordinance merely shifts the alleged problem elsewhere. GHAs are banned in R-1 and R-2 districts, but may operate in R-3, R-4, and commercial zones with a special-use permit. SOF ¶5. That structure assumes the alleged harms either do not occur or matter less in those zones. Rockford has no evidence for that assumption. Dr. Yeh expressly testified that she has not analyzed whether GHAs in R-3 or R-4 areas reduce nearby multifamily home prices, and that the literature she reviewed "largely does not look at that." *Id*. ¶94.

Because the Ordinance is overbroad as to the populations it covers, underinclusive as to the harms it claims to address, and unsupported as to the zones where it permits GHAs, it fails even ordinary rational-basis review.

### CONCLUSION

For the reasons set forth above, Plaintiffs respectfully ask this Court to grant their motion for summary judgment against Defendant City of Rockford on their claim that the City's "Group Home for Adjustment" Ordinance violates the Fourteenth Amendment.

Respectfully submitted,

/s/ Mark G. Weinberg
/s/ Adele D. Nicholas
*Counsel for Plaintiffs*

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net

---

[9] Relatedly, the Ordinance applies only to persons under criminal supervision. It does not apply to individuals with past sex offense convictions who have completed their supervision. Three individuals on the registry who have completed parole may live together in an R-1 or R-2 zone. When asked whether such an arrangement would produce the same price effects as a supervised GHA, Dr. Yeh testified: "yes, I think the literature suggests that [there would be a price reduction]." SOF ¶ 93.

30

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com